582 So.2d 695 (1991)
Darren Keith DAVIS, Appellant,
v.
STATE of Florida, Appellee.
No. 89-01053.
District Court of Appeal of Florida, First District.
June 26, 1991.
*696 Henry R. Barksdale of Henry R. Barksdale, P.A., Milton, and Spiro T. Kypreos, Pensacola, for appellant.
*697 Robert A. Butterworth, Atty. Gen., and Gypsy Bailey, Asst. Atty. Gen., Tallahassee, for appellee.
BOOTH, Judge.
This cause is before us on appeal from a judgment and sentence for murder in the second degree. Appellant contends: (1) that the trial court erred in admitting into evidence certain alleged confessions made by him because the State failed to present sufficient evidence of the corpus delicti of homicide; and (2) that the evidence adduced by the State was consistent with what he argues is a reasonable hypothesis of innocence, thereby entitling him to a judgment of acquittal on the homicide as charged and on all lesser-included offenses. Finding no merit in either of appellant's arguments, we affirm the judgment and sentence.
Testimony at trial revealed that appellant, a self-admitted drug dealer, was himself the victim of a "rip-off" when, in late December of 1985, persons unknown to him and posing as law enforcement officers, barged into his residence at gunpoint and made off with sundry items including several thousand dollars worth of marijuana he had for sale. The purloined marijuana was part of a stash placed with appellant on consignment by his supplier, one Steven Stokes.
Since Stokes had "fronted" him the marijuana for sale and thus had a financial stake in its recovery, appellant telephoned Stokes to advise him of the robbery and to ask whether Stokes knew who might be responsible. In short order, Stokes and appellant settled on the names of three persons as prime suspects. Two of the suspected persons, Scott Gates and John Newbauer, managed to persuade appellant that they knew nothing about the robbery. The third, Jason (Jay) Coates, denied any involvement in the enterprise but implicated a coworker, Timothy Lowe, the victim in this case. According to Coates, Lowe had more money and marijuana in the days immediately following the robbery than he normally carried.
Apparently persuaded by Coates that the hapless Lowe was responsible for the robbery and taking his cue from an episode of Miami Vice he had earlier seen, appellant concocted a bizarre scheme to force Lowe to admit his involvement and reveal the whereabouts of the stolen marijuana. First, he sent a friend to purchase a pair of handcuffs. Next, he arranged to have Coates deliver Lowe to his home under the ruse of purchasing drugs on payday.
On January 3, 1986, after Coates and Lowe had cashed their paychecks, Coates drove Lowe to appellant's home. The three smoked a "joint" of marijuana, after which appellant forced Lowe at gunpoint to don the handcuffs, and the three men got into Coates' automobile and drove north out of Pensacola. In a rural area of Escambia County, appellant directed Coates to stop at a convenience store and purchase a gallon of syrup. The purchase made, Coates drove the car to a remote, heavily-wooded, swampy area where appellant ordered Lowe out of the car. Leaving Coates at the car, appellant, carrying a gun and the gallon of syrup, escorted Lowe into the woods. A few minutes later, Coates heard a single gunshot. When appellant returned to the car about ten minutes later, his clothes were muddy, and he was carrying the empty syrup container and the clothing and shoes Lowe had been wearing. Appellant split the money in Lowe's wallet with Coates and stuffed Lowe's clothes into the syrup container. On their way back to Pensacola, appellant threw the syrup jar and its contents into a creek and commented that Timothy Lowe "wouldn't never have to worry about ripping nobody else off." According to Coates, appellant also threatened to kill him "if I ever opened my mouth." Neither Timothy Lowe nor his remains have ever been found.
When appellant and Coates got back to Pensacola, they drove to Coates' residence, where appellant discarded the clothing he had been wearing and borrowed other clothes from Coates. Later that evening, Coates left the Pensacola area for South Florida.
*698 Within a few days, word of Timothy Lowe's disappearance spread through the area's drug subculture. Investigators from the Escambia County Sheriff's Office questioned appellant, who denied any knowledge of or involvement in the matter.
Sometime later, appellant was arrested on unrelated criminal charges stemming from a shoot-out with law enforcement officers, and he was lodged in the Escambia County Jail. While there, he was visited several times by a young woman friend of his, Georgette Harris. On one of these visits, he told Ms. Harris the approximate location of Timothy Lowe's body and, believing that the authorities would somehow look favorably on one who helped locate the body of the missing Lowe, urged her to call "Crime Stoppers," a program designed to encourage citizens to report by telephone crimes of which they have knowledge. Ms. Harris did so and, shortly thereafter, was sought out by Escambia County Sheriff's investigators, to whom she related what appellant had told her.
On January 23, 1987, a little over a year after Timothy Lowe's disappearance, appellant gave investigators a recorded statement of the events preceding Lowe's demise. He admitted kidnapping, stripping, and handcuffing Lowe to a tree and dousing him with syrup. He maintained, however, that he had left Lowe alive, handcuffed and syrup-drenched, in the woods. Appellant recounted that he and Steven Stokes had returned to the place where Lowe had been left; that Lowe was still alive but "pretty eaten up by the bugs and everything ... scared, too, cause he really didn't know what was goin' on"; that Stokes "cut the boy's throat and left him there to die"; and that he and Stokes left the area and returned to Pensacola. Appellant denied that either he or Stokes returned to the site thereafter. He concluded his statement by giving investigators rather detailed directions to the place Lowe's body could be found.[1] Law enforcement officers conducted a lengthy search of the area, but no remains were ever found.
In early May of 1987, appellant pled no contest to unrelated felony charges and was sentenced to a term of years in the Department of Corrections. In July of 1987, he was assigned to serve his term at the Tomoka Correctional Institution near Daytona Beach. While there, appellant made the acquaintance of one Michael Evans, an inmate who had a friend who worked in the institution's law library. Appellant asked Evans to request his friend to research whether he (appellant) could be charged with first-degree murder if the body of his victim could not be found. According to Evans, appellant told him the details of Timothy Lowe's murder and "mentioned burying the guy." Evans relayed what appellant told him to a police officer acquaintance of his, who in turn alerted Escambia County authorities.
Based on information gathered during the investigation of Timothy Lowe's disappearance from a variety of sources, including Michael Evans, the State Attorney for the First Judicial Circuit secured an indictment of appellant in early September 1988 on charges of first-degree murder, armed robbery, kidnapping, and conspiracy to kidnap.
At trial, the State called Timothy Lowe's mother, his girlfriend, and his employer to establish that Lowe was not the kind of person to just voluntarily disappear and drop out of sight. His mother testified that, except for the nine months he was married, he had lived with her all his life and rarely missed a day without at least speaking with her on the telephone. To her knowledge, he was not ill nor did he have any kind of addiction or other health-threatening condition. She last saw or heard from Timothy Lowe on what the jury later found to be the last or next-to-last day of his life.
Lowe's girlfriend, Tina Brock, echoed his mother's testimony and added that she and Timothy had plans for the evening he disappeared *699 and further that they were contemplating marriage at some time in the future. With regard to the frequency of their contacts, she testified that she either saw him or he telephoned her every day. Like his mother, she had not heard from Lowe since the day of his disappearance.
Mr. Lister, in whose drywall business Timothy Lowe and Jay Coates worked, testified that Lowe was a good and dependable employee who was "never late for work" and, indeed, had never missed a day of work. Lister's recollection of Lowe's last words to him on the Friday Lowe disappeared was "he told me that he would see me Monday morning."
The jury found appellant guilty of murder in the second degree, a lesser-included offense of first-degree murder charged in Count I of the indictment, and guilty as charged on the other three counts of the indictment. The trial court adjudicated appellant guilty in accordance with the jury verdicts and sentenced appellant to three concurrent life sentences on the murder, armed robbery, and kidnapping counts, and a concurrent 30-year sentence on the conspiracy count. This appeal followed.
During the trial, the court permitted witnesses Hunter, Stokes, Harris, and Evans to testify during the State's case-in-chief regarding various statements made by appellant. The defense objected on the ground that the State had not established the corpus delicti of the homicide charge. The admission of this testimony forms the primary basis for the instant appeal. The testimony at issue can be summarized as follows:
1. Richard Hunter, a cocaine-dealing acquaintance of appellant, testified that after he heard the rumors concerning Timothy Lowe's disappearance, he confronted appellant about the matter. According to Hunter, appellant allowed as how he had "burned" Lowe, which Hunter took to mean that appellant had killed Lowe.
2. Steven Stokes, appellant's drug supplier, testified that appellant told him where Lowe's body could be found and requested that Stokes bury the body if appellant was charged with murder.
3. Georgette Harris, the girlfriend of appellant who alerted Crime Stoppers to Lowe's disappearance, testified that appellant told her that even if authorities located Timothy Lowe's body, they would be unable to determine how he died because his throat had been cut.
4. Michael Evans testified to what appellant told Evans about the way Timothy Lowe had been killed.
We affirm without deciding whether any of the foregoing-described statements are "confessions." Thus, even assuming that one or more of the above-listed statements can be said to amount to a confession, the trial court did not err in admitting the testimony.
Under Florida law, the corpus delicti of homicide consists of three elements: (1) the death of a person; (2) the criminal agency of another person as the cause of death; and (3) the identity of the victim. Farinas v. State, 569 So.2d 425, 430 (Fla. 1990); Bassett v. State, 449 So.2d 803, 807 (Fla. 1984); Jefferson v. State, 128 So.2d 132, 135 (Fla. 1961). The State bears the burden of proving the corpus delicti before a defendant's confession may be admitted into evidence. State v. Allen, 335 So.2d 823 (Fla. 1976). Although there must be independent proof of the corpus delicti to admit a confession, it is enough if the independent evidence "tends to show that the crime was committed." Farinas v. State, 569 So.2d at 430. Proof beyond a reasonable doubt is not mandatory. Bassett v. State, 449 So.2d at 807; see also Sochor v. State, 580 So.2d 595 (Fla. 1991). Circumstantial evidence may provide the necessary prima facie proof of the corpus delicti, State v. Allen, 335 So.2d at 825. The State need not prove defendant's guilt before his confession may be admitted. The Florida Supreme Court in Allen, supra, held:
Indeed, as this Court has stated before, it is preferable that the occurrence of a crime be established before any evidence is admitted to show the identity of the guilty party, even though it is often difficult to segregate the two.
*700 A causal connection between the defendant and the crime is not required to be shown. Nor is the discovery or production of a dead body necessary to establish the corpus delicti. See Sochor v. State, supra; State v. Snowden, 345 So.2d 856 (Fla. 1st DCA 1977); State v. Quillin, 49 Wash. App. 155, 741 P.2d 589 (Wash. App. 1987). Moreover, the foundational evidence necessary to prove corpus delicti need not eliminate possible noncriminal explanations of a victim's disappearance. Thus, the confession of one charged with homicide is admissible, even though remains of the victim are not found, where evidence is adduced that "tends" to show that a homicide was committed or allows a reasonable inference that the alleged victim could be dead due to a criminal agency. It is unnecessary to negate all noncriminal explanations of the event prior to the admission of the confession. See People v. Bolinski, 260 Cal. App.2d 705, 67 Cal. Rptr. 347 (1968).
It is perhaps appropriate to note at this point that not all extrajudicial statements against interest amount to "confessions," notwithstanding that some Florida courts as well as courts in other jurisdictions have, on occasion, used the words "confession" and "admission" interchangeably to describe such statements. In Nelson v. State, 372 So.2d 949 (Fla. 2d DCA 1979), the court, citing Parrish v. State, 90 Fla. 25, 105 So. 130 (1925), distinguished "confessions," which are complete acknowledgments of a criminal act, from "admissions," which are statements from which guilt may be inferred. While confessions are inadmissible until the State presents prima facie evidence of the corpus delicti, admissions are admissible as prima facie evidence of the corpus delicti. Padro v. State, 428 So.2d 290 (Fla. 3d DCA 1983); Nelson v. State, supra at 951; C. Ehrhardt, Florida Evidence § 803.18 at 515 (2d ed. 1984).
We assume, without deciding, that one or more of appellant's statements to Richard Hunter, Steven Stokes, Georgette Harris, or Michael Evans constitutes a full "confession," rather than a mere admission, and thus requires independent proof of the corpus delicti. The first issue, then, is whether the other evidence adduced by the State, excluding the testimony to which appellant objects, permits a reasonable inference that Timothy Lowe died as a result of the criminal act of a third party. We hold that it does.
Even without the testimony objected to by appellant, the State introduced abundant nonconfession evidence from which the jury could reasonably infer that Timothy Lowe died as the result of the criminal agency of another person. The testimony of Jay Coates, who personally observed all but those incidents which took place while appellant and Lowe were in the woods alone; appellant's pretrial statement relating to his commission of other offenses against the victim; appellant's res gestae statement to Coates that Lowe "wouldn't never have to worry about ripping nobody else off again"; and the testimony of the victim's mother, girlfriend, and employer regarding his habits, were more than ample to establish the predicate for admission of the testimony to which appellant objected at trial. We therefore affirm as to the first issue.
Appellant next argues that because the State's evidence of his guilt of second-degree murder was circumstantial, he was entitled to a judgment of acquittal because such evidence was consistent with what he maintains was a reasonable hypothesis of innocence. However, in view of our finding that the nonconfession evidence was more than sufficient to establish the corpus delicti of an unlawful homicide, the State's case cannot be described as circumstantial only. Confessions constitute direct, rather than circumstantial evidence. Hardwick v. State, 521 So.2d 1071, 1075 (Fla. 1988); Dunn v. State, 454 So.2d 641, 642 (Fla. 5th DCA 1984), and to the extent that appellant's statements were confessional, they constituted direct evidence.
Appellant's conviction and sentence are affirmed.
SMITH, J., concurs.
ZEHMER, J., concurs in result.
NOTES
[1] Appellant took the stand and testified substantially in accord with his recorded statement. That is not at issue here.