GROSS, C.J.
 

 We reverse for a new trial because the trial judge abused his discretion by responding to the jury’s question about the availability of transcripts in the negative, without advising the jury about the potential for read backs of witnesses’ testimony, ignoring the request of both the state and defense. We also note that the trial judge’s apparent adoption of an ad hoc rule prohibiting read backs amounted to a failure to exercise the discretion granted to trial judges in this area.
 

 Mark Barrow was convicted of the first degree murder of Rae Meichelle Tener, whose body was never found. No witness observed the murder, nor did any witness observe any violence between Barrow and Tener on the night she disappeared.
 

 By way of background, appellant lived in a trailer park with his girlfriend, Peggy LaSalle, and her two daughters. The victim and her 13 year old son, Zack Tener, lived in the same trailer park. Importantly, the victim had a history of disappearing for days at a time, leaving her young son alone.
 

 On the night the victim was last seen, appellant hosted a drinking party in his trailer. Some of the partygoers testified at trial, not always consistently, their memories perhaps clouded by alcohol and drugs. From their testimony, this version of the party emerged.
 

 
 *214
 
 Shannon Rasmussen and her boyfriend Mark Jones were part of a group that included the victim’s son, Zack. The group was hanging out at appellant’s trailer playing a drinking game and “doing weed.” At some point, Zack passed out on a couch. The victim came to appellant’s trailer around 11:00 p.m. and she and appellant took Zack home to the victim’s trailer. After a while, appellant and the victim returned to appellant’s trailer. Both appeared to be “buzzed.” Jones and Rasmussen left once the victim asked them to leave appellant’s trailer.
 

 When Zack awoke in the morning, his mother was not home. Zack walked to appellant’s trailer and saw two packs of his mother’s “cherry cigars” and a lighter on the ground. He looked in appellant’s trailer and saw him asleep on the couch. He picked up his mother’s cigars and lighter and went home. On cross-examination, Zack said the cigars were not “messed up” and he had not seen any blood where he found them.
 

 A few days after the victim was last seen, her mother went to the victim’s trailer and found all of her daughter’s belongings. The victim’s car was in her driveway. Her driver’s license and money were in pants on the floor of the bedroom.
 

 When the state called Peggy LaSalle to the stand, appellant objected on the ground that the state had not established a corpus delicti. The trial court overruled the objection.
 

 Peggy testified that she had known the victim since eighth grade. Peggy was not at the party in her trailer on the day the victim was last seen because appellant had driven her to a drug rehabilitation facility to cope with a Xanax overdose. The next day, Peggy called someone to wake appellant so he could pick her up. When he arrived, appellant was not acting “normal.” He seemed angry, and there was a stench in the van that had not been there the day before. Peggy asked appellant what was wrong. He started crying and punching the steering wheel. At home, he explained that the house was trashed because he had hosted a party.
 

 Several days later, after detectives interviewed appellant about the victim, Peggy asked him where she might be. Appellant did not answer. Peggy found the victim’s car keys in the van and gave them to appellant.
 

 Some time later, in a room she was cleaning, Peggy smelled the stench she had first smelled in the van, only stronger. The odor emanated from a brown paper bag containing a pair of jeans covered in blood. Peggy confronted appellant with this discovery.
 

 Ultimately, appellant told Peggy he had killed the victim. He said that, after the victim made sexual advances to him, he physically threw her out of the trailer. She hit her head and was bleeding. When the victim threatened to call the police, appellant “snapped,” because he did not want to go to jail again. He picked her up and hit her head on a rock. Then he put her body in a black trash bag, put the bag on the passenger seat in his van, and drove her to water. Once there, he hit her with a sledge hammer, looped a “plastic thing” around her neck, put his foot on the victim’s shoulder, and broke her neck. He then picked up her body and threw it into the water. According to Peggy, appellant stripped on the way home and threw his clothes out the window. Appellant told Peggy that the passenger seat was covered with blood before he came to pick her up, so he wiped it up with a big towel.
 

 Peggy related appellant’s story to an ex-boyfriend, who told the police. The police came to interview Peggy the next day. In
 
 *215
 
 this same time period, the trailer was severely damaged by hurricanes.
 

 On cross-examination, Peggy agreed that she would have been upset if she had found out that appellant was with the victim. She had previously filed a domestic violence complaint against appellant, in which she claimed that he had thrown her out of the trailer, causing her to hit her head on a rock. Peggy’s testimony was not consistent with the statements she gave the police. For example, she could not explain how appellant could have been covered with blood and yet stop at a gas station and pay for gas in cash, which would require a trip inside.
 

 Various state witnesses testified concerning forensic evidence removed from appellant’s van. In the back of the van, a technician found a cell phone box containing a phone that had blood in the screw areas. Six areas of the van seats and doors initially tested positive for blood. No blood was detected in the foam cushions of the seats. DNA was detected in three locations — including blood from the cell phone and from the left side of the passenger seat. All of the DNA came from the same donor. The police took samples from appellant, Zack, and the victim’s mother; appellant was excluded as being the donor. The test could not exclude Zack as the biological child of the DNA donor, or the mother as the biological parent. The state offered expert testimony that the blood in the van came from the victim. No fingerprints were recovered.
 

 Appellant gave two recorded statements to the police, which were both played at trial. In the first statement, he told the detectives that he did not like the victim, because she gave Peggy Xanax. He also stated that he had never had a sexual relationship with the victim because she was “a whore.” Appellant said that on the night the victim disappeared, she came to his trailer looking for Peggy and was there for two minutes. He had been to the victim’s trailer one time about a week and a half before. He asserted that Zack was lying if he said appellant had gone to the victim’s trailer on the night she was last seen.
 

 After the detective talked with Peggy a second time, he conducted a second interview with appellant, which was played for the jury over his corpus delicti objection. On the tape, appellant described the party at his trailer and said it ended about 1:30 a.m.; he then had another beer and went to bed. The victim was not at the party, although she came to the trailer twice, once to get Zack and once for Peggy. After appellant told her Peggy was in rehab, she left. He was unsure about the time, however, because he was drunk. Appellant denied having a conversation with Peggy about the victim, whom he did not like because she did drugs and was a “slut.” He agreed that the victim had come on to him three times before, but said she had not tried anything that night. She left by herself. He said the victim had been in the van at some point before that night when she and Peggy had gone to the store with him.
 

 Ten minutes into its deliberations, the jury sent out a question asking for “all the transcripts of the witnesses’ testimonies, Zack, Shannon, Peggy, Mark Jones, Mark Barrow.” The trial judge told the lawyers that he received that question in every trial. The trial judge observed that because there were no transcripts, his response would be that “there are no transcripts.” The prosecutor suggested that the trial judge tell the jury that they could request read backs. Instead, the trial judge responded, “No, I don’t do read backs.”
 

 
 *216
 
 Then, noting that the defense attorney was giving him “that Courthouse common law look,” the trial judge discussed case law, with citations, supporting the proposition that the jury was not entitled to a read back because the issue was within the broad discretion of the trial court.
 
 [1]
 
 The trial judge ruled that he would not tell the jury about read backs, saying that for the jury
 

 to ask within the first ten minutes to have the entire trial read back to them, that’s impractical, can’t be done. They took copious notes. That’s why I let them have notes. They should rely on their own recollection. So, I am not going to put in there that they can ask for read backs. I am just going to write ... that there are no transcripts, please rely on your own recollection of the proceedings.
 

 The defense attorney then asked the trial judge to instruct the jury that they have a right to ask the court for a read back. The trial court denied the request and sent the jury a note saying
 

 There are no transcripts available for your review. Please rely on the evidence presented during the proceedings.
 

 Hours later, the jury found appellant guilty of first degree murder.
 

 A major question presented in this case is the obligation of a trial judge in a criminal case when faced with a deliberating jury’s request to see transcripts.
 

 Florida Rule of Criminal Procedure 3.410 concerns a jury’s request for “any testimony” to be “read to them”:
 

 After the jurors have retired to consider their verdict, if they request additional instructions or to have any testimony read to them they shall be conducted into the courtroom by the officer who has them in charge and the court may give them the additional instructions or may order the testimony read to them. The instructions shall be given and the testimony read only after notice to the prosecuting attorney and to counsel for the defendant.
 

 Rule B.410 gives a trial judge “wide latitude in the area of the reading of testimony to the jury.” '
 
 Avila v. State,
 
 781 So.2d 413, 415 (Fla. 4th DCA 2001). The Florida Supreme Court has recognized that “courts have found no abuse of discretion even where the trial judge has, without much consideration, entirely rejected the jury’s request for a read back.”
 
 Francis v. State,
 
 808 So.2d 110, 130 (Fla.2001) (citing
 
 McKee v. State,
 
 712 So.2d 837, 838 (Fla. 2d DCA 1998)).
 

 However, several Florida cases have found an abuse of judicial discretion when
 
 *217
 
 a trial court responds to a jury question about trial testimony or transcripts
 
 without
 
 letting the jurors know that they may ask for testimony to be read back to them.
 

 The leading case is
 
 Roper v. State,
 
 608 So.2d 533 (Fla. 5th DCA 1992). This case involved sexual abuse of a minor. The deliberating jury “asked to ‘see’ the victim’s cross-examination testimony.”
 
 Id.
 
 at 533. After conferring with the attorneys, the trial judge told the jury that no transcript was available to them, so there was no way that the jury could “see” the victim’s cross examination.
 
 Id.
 
 at 533-34. The judge told the jury to “rely upon your collective recollections and remembrances as to what each of the witnesses testified to in order to render your verdict.”
 
 Id.
 
 at 534.
 

 On appeal, the state argued “that if the jury does not ask that the testimony be
 
 read
 
 back, but only requests to
 
 see
 
 a transcript, the court does not abuse its discretion by simply instructing the jury to rely upon their recollections.”
 
 Id.
 
 at 535. The fifth district rejected this argument, writing that the judge’s response to the jury’s question “may well have led the jury to conclude that their
 
 only
 
 recourse was to rely upon their ‘collective recollections and remembrances’ as to the cross-examination of the minor.”
 
 Id.
 
 In analysis equally applicable to this case, the fifth district concluded in
 
 Roper
 
 that
 

 the trial judge here narrowly focused upon the word “see” (as distinguished from “hear”) in the jury’s request and deftly side-stepped the problem. As we see it, he employed a semantic shell game effectively negating an option allowed the jury under Rule 3.410. At the very least, the trial judge should have apprised the jury that a method was available to have the cross-examination, or specific portions of it, read to them. Then, if the jury requested it, the trial court could have weighed that request in light of any applicable considerations.
 

 Id.
 
 at 535. This court cited
 
 Roper
 
 with approval in
 
 Volk v. State,
 
 754 So.2d 82 (Fla. 4th DCA 2000). In a case similar to
 
 Roper,
 
 we found an abuse of discretion where a trial judge responded to a jury question about witness testimony without letting the jury know that a read back of testimony was possible. The jury in
 
 Avila v. State,
 
 781 So.2d 413, 414 (Fla. 4th DCA 2001), stated “that it needed to review the timing of specific events set forth by the testimonies of four named alibi witnesses.” The trial judge told the jury that although the court reporter took “down the trial in shorthand notes,” there were “no printed transcripts” to “submit back to you.”
 
 Id.
 
 at 415.
 

 We held that the trial judge abused his discretion by failing to tell the jury about the potential availability of a read back:
 

 While the trial court has the discretion to deny a jury’s request to read back testimony, it may not mislead the jury into thinking that a readback is prohibited. In this case, the jury clearly sought a readback of specific testimony. The trial court, however, without mentioning that a method of readback was available, informed the jury that there were no transcripts and that the jury members should rely upon their collective recollection. Because such a statement may have confused the jury as to whether a readback of testimony was permissible, we conclude that the trial court abused its discretion.
 

 Id.
 
 at 415-16 (citations omitted);
 
 see also Rigdon v. State,
 
 621 So.2d 475, 479 (Fla. 4th DCA 1993) (finding reversible error in instruction that any request for a read back would be refused, “because the trial judge’s comments may reasonably have conveyed to the jurors that to ask for ...
 
 *218
 
 rereading of testimony would be futile or was prohibited”).
 

 This case falls within the ambit of
 
 Roper
 
 and
 
 Avila.
 
 The jury requested to see “transcripts.” Both the prosecutor and the defense attorney asked that the trial judge tell the jury that it could request read backs. The trial judge refused and told the jury that no transcripts were available for their review. As in
 
 Roper,
 
 the judge’s instruction “effectively negated] an option allowed the jury under Rule 3.410.” 608 So.2d at 535. Especially when asked to do so by both the state and the defense, the court should have apprised the jury that a method of read back was available.
 
 Id.; Avila,
 
 781 So.2d at 415.
 

 We acknowledge that in a recent, similar case, the third district has reached a different result. In
 
 Hazuri v. State,
 
 23 So.3d 857, 857 (Fla. 3d DCA 2009), a deliberating jury asked if they could “get transcripts from the trial.” Defense counsel asked the trial judge to tell the jury that they could have portions of the trial read back to them.
 
 Id.
 
 The trial judge sent the jury a note telling them that there were no transcripts available and that they would have to rely on their collective recollection of the evidence.
 
 Id.
 
 The
 
 Hazuri
 
 majority opinion found no error in the judge’s note, which was “legally accurate;” the court held that “[u]pon giving such an answer, the trial court was under no obligation — as defense counsel suggested — to inform the jurors that a ‘readback’ of trial testimony may be available upon request.”
 
 Id.
 
 at 859.
 
 [2]
 

 We certify conflict with
 
 Hazuri.
 
 We believe that
 
 Roper
 
 and
 
 Avila
 
 are more in harmony with Florida’s view of a jury’s role in a criminal trial. Florida law encourages a jury to make a considered, careful evaluation of detailed evidence. As the Supreme Court has written, the “jury has a perfect right to return to the court room at any time and ask questions that are calculated to shed light on the controversy or that will in any way assist it or the court in developing the truth of the controversy.”
 
 Sutton v. State,
 
 51 So.2d 725, 726 (Fla.1951). Part of a trial judge’s role is to forthrightly make the jury aware of those tools available under the rules of criminal procedure that will assist the jury in arriving at its decision. The judge’s role is to facilitate careful deliberation. Deference should be accorded to a jury’s request to more closely examine the trial testimony.
 
 See LaMonte v. State,
 
 145 So.2d 889, 892 (Fla. 2d DCA 1962).
 

 As a second area of concern, we note that the lawyers’ request that the jury be advised of the availability of read backs may have been fruitless, in light of the judge’s stated policy: “I don’t do read backs.” It is an abuse of discretion for a trial judge to
 
 refuse
 
 to exercise discretion, to rely on an inflexible rule for a decision that the law places in the judge’s discretion. As Justice Thompson wrote in his concurrence to
 
 Barber v. State,
 
 5 Fla. 199,
 
 *219
 
 206 (Fla.1853), the trial court’s “discretion is not an arbitrary exercise of the will and pleasure of the Judge, but it is a sound legal discretion, to be exercised according to the exigency of the case, upon a consideration of the attending circumstances.”
 
 See Massey v. State,
 
 50 Fla. 109, 112, 39 So. 790 (Fla.1905) (refusal to exercise discretion, “without any good reason for so doing,” deprives party of a substantial right);
 
 Boykin v. Garrison,
 
 658 So.2d 1090, 1090 (Fla. 4th DCA 1995) (where the court wrote that “[t]he law is well settled that a trial court must exercise its discretion where discretion has been provided; a refusal to so exercise is error.”);
 
 see also Albert v. Miami Transit Co.,
 
 154 Fla. 186, 17 So.2d 89, 90 (1944) (discussing the limits of judicial discretion);
 
 [3]
 

 Fla. Fire & Cas. Ins. Co. v. Hart,
 
 73 Fla. 970, 975-77, 75 So. 528 (Fla.1917) (trial court deprives a party of a substantial right when it refuses to exercise its discretion on motion for new trial);
 
 Steinmann v. State,
 
 839 So.2d 832 (Fla. 4th DCA 2003) (where court wrote that “[i]t is error for the trial court to refuse or fail to exercise its discretion.” (citations omitted)).
 

 We do not find the error in the trial court’s response to the jury’s question to be harmless. The decision in this case turned on the details. The jury asked for transcripts of the testimony of key witnesses who had first-hand knowledge of the events the night the victim disappeared, as well as the testimony of Peggy, who testified about appellant’s confession, and the statements appellant gave to the police. The witnesses from the party in appellant’s trailer were drunk or high on the night in question and their testimony varied on key points.
 

 Peggy herself was not a strong witness. Her testimony conflicted with her earlier version of Barrow’s confession, and she told the jury that she did not care, because the details did not matter. She had multiple reasons to be angry with appellant. She had recanted an accusation that appellant had attacked her in exactly the same manner she said he confessed to attacking the victim—by throwing her out of the trailer onto a rock. The fact that Zack did not see any blood when he found the cherry cigars casts doubt on Peggy’s testimony that appellant had killed the victim by smashing her head on a rock in the same general area where the cherry cigars were found.
 

 To conclude that an error is harmless, we must find “beyond a reasonable doubt” that the error “did not affect the jury’s verdict.”
 
 State v. Powell,
 
 998 So.2d 531, 542 (Fla.2008) (citation omitted). Given the details, we cannot say that the inability of the jury to more closely examine the conflicting evidence did not affect its verdict.
 

 On a remaining issue, we agree with the trial court that the state established the corpus delicti in this case so that Peggy’s testimony of appellant’s confession was properly admitted.
 

 
 *220
 
 “To admit a defendant’s confession, the state must prove the corpus delicti either by direct or circumstantial evidence.... [P]roof beyond a reasonable doubt is not mandatory.”
 
 Meyers v. State,
 
 704 So.2d 1368, 1369-70 (Fla.1997) (citations omitted). The phrase “corpus de-licti”
 

 refers to proof independent of a confession that the crime charged was in fact committed.
 
 Bassett v. State,
 
 449 So.2d 803, 807 (Fla.1984). In order to prove corpus delicti in a homicide case, the state must establish: (1) the fact of death; (2) the criminal agency of another person as the cause thereof; and (3) the identity of the deceased person.
 
 Id.
 
 Regarding the second element — the criminal agency of another — the proof need not show that the defendant committed the crime.
 

 Id.
 
 at 1369 (footnote omitted).
 

 Here, the state established the corpus delicti based on
 
 State v. Lindsey,
 
 738 So.2d 974, 977 (Fla. 5th DCA 1999). That case held that the corpus delicti of murder was established by evidence that (1) the victims’ continued absences without contacting family or friends were out of character for them and (2) the victims’ belongings left at their residences indicated that their absence was neither voluntary nor planned.
 
 Id.
 
 Similarly in
 
 Crain v. State,
 
 894 So.2d 59, 72 (Fla.2004), the corpus delicti was established by evidence that a young child was last seen alive in the presence of Crain, that her blood was found on his clothing, that scratch marks were found on him, and that he had bleached his bathroom in the middle of the night and exhibited other unusual behavior the next morning.
 

 In this case, the victim had not taken any of her belongings with her, including her identification and money. Three years had elapsed from the time the victim was last seen to the time of trial. She was last seen with appellant, and her blood was found in his van. Barrow’s story changed, and it was contradicted by the testimony of witnesses. Such evidence was sufficient to establish a corpus delicti. Even though this is a weaker case than
 
 Lindsey
 
 and
 
 Crain,
 
 in that the victim had a history of disappearing for periods of time, corpus delicti need not be proved beyond a reasonable doubt.
 
 See Davis v. State,
 
 582 So.2d 695, 700 (Fla. 1st DCA 1991) (“[T]he foundational evidence necessary to prove corpus delicti need not eliminate possible noncriminal explanations of a victim’s disappearance.”).
 

 We find no fundamental error in the state’s closing argument.
 

 Reversed and remanded for a new trial.
 

 TAYLOR and HAZOURI, JJ., concur.
 

 [1]
 

 . Omitting the case citations, this is what the judge said:
 

 The question of whether a request for read back of testimony by the jury should be granted is within a broad discretion of the trial court. Just to give you some examples ... in ...
 
 McKee versus State ...
 
 the Court [held] that the trial judge who failed to read back the testimony of the victim, who upon the request of the jury, but instead told the jurors to rely on their own memory, did abuse his broad discretion. Courts have consistently found in denial of a jury’s request for a read back when doing so would not be practical.
 
 Miller versus State ...
 
 finding no abuse of discretion where the court reporter did not have her notes with her.
 
 DeCastro versus State
 
 ... no abuse of discretion where it was not practical because the testimony was extensive and the Court Reporter was tired.
 
 Francis v. State
 
 ... The trial court informed the jury that the testimony requested to be read back would take three hours. The Supreme Court noted, however, that the trial judge made it abundantly clear to the jury that the ultimate decision was theirs. Also, there was extensive discussion between the attorneys and the Court about how to handle the jury’s request.
 

 [2]
 

 . We agree with the comments of Judge Cope in his dissenting opinion in
 
 Hazuri:
 

 The majority opinion finds dispositive the fact that the jury note asked for transcripts. According to the majority, since no transcripts were in existence, it follows that the question could be answered with a simple "no.”
 

 The majority opinion overlooks the fact that jurors are composed of lay persons. If they knew the technical details of the law, then they would have written a better note. But the substance of the question was whether the jury could review the testimony. Defense counsel quite properly said that under rule 3.410, a jury may request to have "testimony read to them,” and the court may so order.
 
 Hazuri v. State,
 
 23 So.3d 857, 861 (Fla. 3d DCA 2009) (Cope, J., dissenting) (emphasis in original) (footnote omitted).
 

 [3]
 

 . The best discussion we have found of judicial discretion is contained in
 
 Albert v. Miami Transit Co.,
 
 154 Fla. 186, 17 So.2d 89, 90 (1944) (citation omitted):
 

 Judicial discretion is not an unleashed power by which a judge may set at naught the rights of parties to a cause and define them as suits his will or the will of others who may seek to influence his judgment. Judicial discretion is a discretion guarded by the legal and moral conventions that mold the acceptable concept of right and justice. If this is not true, then judicial discretion, like equity, will depend on the length of the judge's foot, the state of his temper, the intensity of his prejudice, or perhaps his zeal to reward or punish a litigant. It takes more than a wool-sack and a judicial robe to dehumanize human characteristics that are rehumanized each biennium.