STEVENSON, J.
 

 A jury convicted Michael Wolfe of the first-degree murder of David Jackson, and the trial court adjudicated him guilty and sentenced him to life in prison. On appeal, Wolfe argues that the trial court erred in overruling certain defense objections during his trial. We disagree and affirm Wolfe’s judgment of conviction and sentence.
 

 The narrative which follows is recounted from the testimony at trial most in harmony with the jury’s verdict. Sometime around 1983, the victim, nineteen-year-old Jackson, met Barbara Britton. She became pregnant, and the couple married. Barbara continued to live with her parents though, and after she gave birth to their son, Jackson continually had to fight for visitation. Eventually, they divorced. In June 1987, Barbara met and married the defendant, Michael Wolfe, and they moved from Broward County to Arizona with the baby. In November 1987, Jackson and his friend, Alvaro Bracho, visited Barbara and the baby in Arizona.
 

 Subsequently, Jackson was awarded visitation in Florida during the second and third week of July 1988. Jackson told his mother, Judy Carlson, that he wanted to get back together with Barbara. On June 25, 1988, prior to Barbara and the baby’s scheduled arrival in South Florida, Carlson called her son at 8 p.m. His roommate, Bracho, explained that Jackson had received a phone call from a woman, showered, borrowed a couple of dollars, and said he would be back later. Carlson never heard back from her son, and he neither went to work the next day, nor picked his brother up from the airport as planned.
 

 Bracho and Carlson reported Jackson missing. On September 22, 1988, police recovered Jackson’s car at the Fort Laud-erdale airport. It had been there for only thirty-five days, even though Jackson had been missing for eighty-eight. No fingerprints were found in the car, but officers recovered a six-pack of Heineken with one beer missing and a box of bullets. Jackson owned several guns and always kept one in his bedroom and one in his car. The gun he was known to keep under the front seat of his ear has never been recovered.
 

 
 *230
 
 During the summer of 1989, a construction worker, building a Wal-Mart in Bro-ward County, discovered some bones and notified the police. The medical examiner determined the bones were human, so officers returned to the scene and recovered an additional twenty-one bones. The bones did not show any sign of trauma, and did not have any sufficient identifying factors, especially because a skull was never found.
 

 In 2003, police contacted Carlson regarding Jackson’s cold case. Carlson supplied them with a letter written by Jackson to a friend named Sue five days before he went missing. In Jackson’s letter to Sue, he mentioned Barbara’s impending visit and his hope that they would get back together. Carlson also provided the officers with a DNA sample, which was used to match the bones discovered at the Wal-Mart construction site to her son. There was only a six in 10,000 chance this match was a coincidence.
 

 After identifying the bones, the missing persons unit recommenced investigating the case. Wolfe had adopted Jackson’s son after his disappearance, but in 1993, Wolfe and Barbara divorced. In 2003, Wolfe lived in Ohio. Pembroke Pines officers traveled to his home, and though Wolfe was not there, he voluntarily met the officers at the local police station the next day. While at the station, Wolfe wrote a letter, explaining that three months before Jackson disappeared, Barbara, the baby, and he visited Barbara’s parents in South Florida. Barbara’s parents lived approximately two miles from the Wal-Mart. Wolfe and Barbara’s father, Harry, went for a walk, and Harry expressed concern about allegations that Jackson abused the baby. Harry suggested that Jackson “should be gone.” Wolfe, unsure if Harry was serious, advised that the park they were in would be a good spot to dispose of a body due to salt in the sand. Wolfe suggested using Barbara as bait to lure Jackson to a place where Harry could use a small caliber gun, a .22, to shoot Jackson in the head once or twice. Wolfe explained that he did not know if Harry would listen, and when Barbara and the baby returned to Florida the week of Jackson’s disappearance, there was no mention to Wolfe of any foul play. According to Wolfe, Barbara and the baby had simply gone to South Florida before the scheduled July visitation in order to see Barbara’s parents.
 

 Upon further investigation, police learned Wolfe had been a military police officer in the air force, and twenty-one days before Jackson’s disappearance, he obtained a federal firearms license. His gun sales records reflected he had sold a firearm to Nancy Graham. Graham, who resided in Alabama in 2003, was contacted by police and explained that she had been married to Wolfe from 1993 to 1998. Prior to divorcing, Barbara and Wolfe moved from Arizona back to South Florida. After they split, Wolfe met Graham and began living with her in Fort Lauderdale. One night, while sitting on the patio drinking alcohol, Wolfe mentioned to Graham that his son’s biological father, Jackson, had gone missing. He stated that Barbara and her father had come up with a plan to get rid of Jackson because Jackson had been abusing the baby. Wolfe went along with the plan, and he and Barbara flew from Arizona to Fort Lauderdale under assumed names, using other people’s identification cards. Then, Barbara contacted Jackson and asked him to meet her at a motel, but not tell anyone she was in town. Wolfe was in the motel bathroom, drunk. When Jackson arrived, Wolfe shot him in the head twice. Barbara and Harry cleaned up; then, Wolfe and Harry took Jackson’s car to the airport. Next, Wolfe and Harry took Jackson’s body to a lot and
 
 *231
 
 buried him. Subsequently, Harry learned about construction of a Wal-Mart at that site, so Wolfe and Barbara again flew from Arizona to Florida, and Wolfe and Harry dug up the bones and put them in the trashcans outside Harry’s home.
 

 Based on Graham’s statement, an arrest warrant issued for Wolfe. When arrested during a traffic stop in Ohio, Wolfe replied, “I’m f****d.” The story was on the news, and Carol Larson, Wolfe’s wife of twelve years before he met Barbara, learned about Wolfe’s arrest. She contacted officers and explained that several years after Wolfe and Barbara divorced, she was attending nursing school outside of Orlando, and Wolfe contacted her. This was during the time Wolfe lived with Graham. One night, while drinking, Wolfe confessed to killing Barbara’s ex-husband in a motel room by twice shooting him in the head.
 

 Wolfe was indicted for first-degree murder. At trial, he testified that only Barbara and the baby were in Florida on the days surrounding Jackson’s disappearance. He denied confessing to Jackson’s murder to either Graham or Larson, but admitted to alcoholism. The jury found him guilty as charged, and the trial court sentenced him to life in prison.
 

 Wolfe avers that the trial court erred in admitting, over objection, his statements to Graham and Larson because the State failed to establish the corpus delicti of murder. “ ‘To admit a defendant’s confession, the state must prove the corpus delicti either by direct or circumstantial evidence.... [P]roof beyond a reasonable doubt is not mandatory.’ ”
 
 Barrow v. State,
 
 27 So.3d 211, 220 (Fla. 4th DCA 2010) (quoting
 
 Meyers v. State,
 
 704 So.2d 1368, 1369 (Fla.1997) (citation omitted)). “ ‘In order to prove corpus delicti in a homicide case, the state must establish: (1) the fact of death; (2) the criminal agency of another person as the cause thereof; and (3) the identity of the deceased person.’ ”
 
 Id.
 
 (quoting
 
 Meyers,
 
 704 So.2d at 1369). Wolfe specifically contests whether there was sufficient evidence proving that the criminal agency of another person caused Jackson’s death. We find Wolfe’s argument unpersuasive.
 

 In order to establish that the criminal agency of another person was the cause of death for purposes of proving the corpus delicti in a homicide case, all that is necessary is that the evidence “ ‘tends’ to show that a homicide was committed or allows a reasonable inference that the alleged victim
 
 could
 
 be dead due to a criminal agency.”
 
 Davis v. State,
 
 582 So.2d 695, 700 (Fla. 1st DCA 1991). It is not necessary that the evidence establish that Wolfe committed the crime.
 
 Barrow,
 
 27 So.3d at 220. The circumstantial evidence in the instant case establishes that Jackson was a responsible person, who paid his bills the day before he went missing; he was close to family and friends and spoke with them regularly; he left his home with only a couple of dollars; and later, his car was found at the airport but his dismantled skeletal remains were found in a once-deserted field two miles from his ex-wife’s parents’ home. Based on the record, we hold that the State presented sufficient circumstantial evidence to allow the reasonable inference that Jackson could be dead due to someone’s criminal agency, thereby establishing the corpus delicti of murder.
 

 Next, Wolfe argues that the trial court erred in permitting the State, over objection, to ask Graham and Larson about Wolfe’s possession of other people’s identification cards during their respective relationships with him, as this amounted to evidence of a collateral offense. Graham, Wolfe’s wife after Barbara, testified that, in 1996, she had moved back to Georgia
 
 *232
 
 and Wolfe decided he wanted to try to reconcile with her and went there as well. While in Georgia, Graham testified that she had gone through Wolfe’s briefcase “and there was a lot of I.D.’s in there that were not his.” Larson, Wolfe’s wife before Barbara, was asked if Wolfe ever had any fake I.D.’s while they were married. Larson replied:
 

 Yes. When we were first married or getting ready to get married, he had — I don’t know five or six driver’s licenses, social security cards of different people. It was weird. Some were older guys, some were young people. I said what is this? He said, oh, you know, people lose their wallets. I was like you wouldn’t give them back? What are you doing with this stuff? He said well, hold on to them. You never, never know.
 

 “Admissible evidence of uncharged crimes falls into two categories: ‘similar fact’ evidence and ‘dissimilar fact’ evidence.”
 
 Victorino v. State,
 
 23 So.3d 87, 98 (Fla.2009) (quoting
 
 Zack v. State,
 
 753 So.2d 9, 16 (Fla.2000)). Dissimilar fact evidence is governed by the general rule of relevancy in section 90.402, Florida Statutes, which states that generally all relevant evidence is admissible unless excluded by law.
 
 Id.
 
 at 98-99. “A trial court’s determination that evidence is relevant and admissible ‘will not be disturbed absent an abuse of discretion.’ ”
 
 Id.
 
 at 98 (quoting
 
 Taylor v. State,
 
 855 So.2d 1, 21 (Fla.2003)). We find no abuse of discretion in the trial court’s admission of the testimony of Larson and Graham concerning Wolfe’s possession of fake I.D. cards.
 

 Placing Wolfe in Florida at the time of the offense was a critical element of the State’s case. Graham testified that Wolfe told her that he and Barbara had flown from Arizona into Fort Lauderdale under assumed names using someone else’s I.D. cards. A police officer’s testimony that there was no independent evidence to corroborate that a “Michael A. Wolfe” flew into Florida from the Southwest or back around June 25, 1988, suggested that Wolfe’s possession of other people’s identifications could be relevant. Moreover, even if testimony about Wolfe’s possession of the identifications was improper because of the somewhat wide “before and after” time span involved, we find the error was harmless. If the jury found Graham and Larson credible, then the jury would have found Wolfe guilty regardless of their testimony about the identifications, and if the jury did not find them credible, the testimony about the identifications still would not have affected its verdict.
 
 See Ventura v. State,
 
 29 So.3d 1086, 1090-91 (Fla.2010) (citing
 
 State v. DiGuilio,
 
 491 So.2d 1129 (Fla.1986)) (rejecting overwhelming evidence test as proper analysis of harmless error and noting that proper analysis considers whether there is a reasonable possibility that the error affected the verdict).
 

 Last, Wolfe contends that the trial court erred in permitting the State to admit at trial, over objection, the letter written by Jackson five days before his disappearance because it was hearsay. In the letter, Jackson stated his son and ex-wife were coming to "visit him, and he hoped things would go well and that they would move in with him. “[O]rdinarily, a victim’s state of mind is not a material issue, nor is it probative of a material issue in a murder case. However, there are some exceptions to this general rule.”
 
 Brooks v. State,
 
 787 So.2d 765, 771 (Fla.2001) (citation omitted). For example, the “victim’s state of mind may be relevant to an element of the crime.”
 
 Id.
 
 (citing
 
 Stoll v. State,
 
 762 So.2d 870 (Fla.2000)). Here, Jackson’s bones did not show any sign of pre-mortem injury, and as discussed above, the State bore the burden of demonstrating that Jackson’s death was the
 
 *233
 
 result of the criminal agency of another.
 
 See Barrow,
 
 27 So.3d at 220. Thus, the State, in its case in chief, needed to demonstrate Jackson had been murdered, as opposed to, for example, having run away or committed suicide. The instant letter falls within the state-of-mind hearsay exception,
 
 see
 
 § 90.803(3)(a)l., Fla. Stat. (2007), because it demonstrates that Jackson wanted to reconcile with Barbara and wanted to be a father to his son. The letter would also explain Jackson’s subsequent conduct in clandestinely meeting Barbara at a motel room, corroborative of the testimony that it was there that he was ambushed by Wolfe.
 

 Accordingly, and based on the foregoing, we find no error in the issues on appeal and affirm.
 

 Affirmed.
 

 GROSS, C.J., and POLEN, J., concur.