QUINCE, J.
We have for review Barrow v. State, 27 So.3d 211 (Fla. 4th DCA 2010), in which the Fourth District Court of Appeal certified conflict with the decision of the Third District Court of Appeal in Hazuri v. State, 23 So.3d 857 (Fla. 3d DCA 2009), quashed, 91 So.3d 836 (Fla.2012). We have jurisdiction. See art. V, § 3(b)(4), Fla. Const. The question before us is whether the trial court abused its discretion when it denied the jury’s request for specific trial transcripts during deliberations without advising the jury of the possibility of a read-back. Finding that the trial court erred, we approve the Fourth District’s decision in Barrow. Because we are unable to find beyond a reasonable doubt that the error did not contribute to the guilty verdict, Barrow is entitled to a new trial.
FACTS
Mark Barrow (Barrow) was charged with the first-degree murder of Rae Michelle Tener, whose body was never discovered. At the time of the murder, Barrow and his then girlfriend, Peggy LaSalle, were living together in a trailer along with Peggy’s two daughters. In a nearby trailer located in the same trailer park, the victim resided with her thirteen-year-old son, Zack. On the evening of August 24, 2004, Barrow hosted a party at his trailer which was attended by the following individuals: Zack, Shannon Rasmussen, Mark Jones, and Dave Barrow (Barrow’s nephew). Peggy did not attend the party because earlier that day Barrow had taken her to a rehabilitation facility, where she spent the night. The State’s theory at trial was that Barrow had killed the victim during the early morning hours of August 25, 2004, after the party had ended.
*828 Rasmussen, Jones, and Zack each testified at trial for the State. The key points of Rasmussen’s testimony were as follows. She and Jones were drinking alcohol and smoking marijuana at the party. Barrow was also smoking marijuana. The victim came to Barrow’s trailer to take Zack, who had passed out, home. Barrow then asked Rasmussen to watch one of Peggy’s daughters for a while, which she agreed to do. Then, Barrow left his trailer with the victim and Zack. The victim and Barrow returned to his trailer, without Zack, about an hour or two later. Upon their return, although initially stating that the victim had asked that she and Jones leave the trailer, Rasmussen testified that Barrow had asked for them to leave because it was late. Jones and Rasmussen complied with the request and left Barrow’s trailer.
Jones’ testimony corroborated Rasmussen’s account of the events transpiring during the course of Barrow’s party. Jones stated that the victim came over to get Zack, and that Barrow went to the victim’s trailer with the victim and Zack. After they had left Barrow’s trailer, Jones and Dave Barrow walked over to the victim’s trailer where Jones observed Barrow and the victim sitting on a bed. Jones also saw that Zack was sleeping on the couch. When Barrow and the victim returned to Barrow’s trailer after being gone for a “couple hours,” they appeared “pretty buzzed” according to Jones. The victim and Barrow were the only people left in Barrow’s trailer when Jones and Rasmussen left.
Contrary to Rasmussen and Jones’ testimonies, Zack testified that he did not fall asleep at Barrow’s trailer and denied that his mother came by to take him home. Instead, Zack said at trial that he drank too much at the party and walked back to his trailer on his own to sleep. Zack testified that after he returned to his trailer, but before falling asleep, he noticed that both his mother and Barrow were present. Around seven or eight o’clock in the morning, Zack woke up and discovered that his mother was not home. He then walked over to Barrow’s trailer where he observed Barrow, through a window, appearing to be asleep on his couch. Zack knocked on Barrow’s trailer, which proved to be unsuccessful in getting Barrow’s attention. As he was leaving Barrow’s trailer, Zack discovered on the ground two packs of cigars which belonged to his mother, as well as a lighter. Zack testified at trial that his mother would drink — sometimes daily. Zack divulged that his mother had left him alone on three or four different occasions, with the longest absence consisting of about three days. Zack added that most of the time she would take her car with her. No witness testified that there was any violence between Barrow and the victim during the course of the party.
Approximately four days after the party was held, the victim’s mother went to her daughter’s trailer. The State called the victim’s mother to testify as to the observations she made. The victim’s car was parked in her driveway. Her bedroom was in disarray. The victim’s pants were located on the bedroom floor, with the pockets containing her driver’s license and money. The victim’s jewelry remained in her trailer. The victim’s keys could not be located. The victim’s mother testified that her daughter would drink.
After the testimonies of Rasmussen, Jones, Zack, and the victim’s mother, the State called Peggy as a witness.[1] Anticipating that Peggy would testify as to statements allegedly made to her by Barrow regarding the victim’s death, counsel *829 for the defense objected to the admission of such statements. The basis of the objection was that the State had not established the corpus delicti of the crime. The trial court overruled the objection.
Peggy’s' crucial testimony is detailed as follows. Barrow picked up Peggy from the rehabilitation facility in his van on August 25, 2004. There was a stench in the van which was not there the day before. Peggy noticed that Barrow was not acting normal and seemed angry. When Peggy asked Barrow what was wrong, Barrow cried and punched the steering wheel. Upon Peggy’s return to their trailer, Peggy noticed that it was “trashed” unlike the prior day. Barrow told Peggy that he had a party and disclosed that the victim came by.
Peggy found keys in Barrow’s van which turned out to belong to the victim. While cleaning inside- the trailer, Peggy came into contact again with the same stench she had smelled earlier in the van, although more potent inside the trailer. The stench originated from bloodied jeans which were contained in a paper bag. Peggy presented this discovery to Barrow who later admitted to her that he had placed the jeans in a dumpster which he set on fire. This testimony conflicted with Peggy’s statement to the police, in which she stated it was Barrow who discovered the bloodied jeans.
Barrow eventually confessed to Peggy and one of her daughters that he had killed the victim. Barrow explained to Peggy that when the guests left the party, the victim was there and made sexual advances toward him. This caused Barrow to become angry. Barrow then took the victim by the neck, kicked the door open, and threw her out of the trailer. The victim cracked her head on a railing causing her to bleed. The victim then threatened to call the police which made Barrow “snap” because he did not want to go to jail. Barrow then proceeded to pick her up and hit her head on a rock. Subsequently, he placed the victim inside a trash bag which was then placed on the passenger seat of his van. Barrow then drove to a body of water after first stopping for gasoline.
Before throwing the victim into the water, Barrow hit her with a sledgehammer, placed a zip tie around her neck, and broke her neck. Peggy believed that Barrow said that he had thrown the sledgehammer into the water as well. For the purpose of hiding any evidence, Barrow threw the clothes he was wearing out of the window on his way home. Barrow admitted that the passenger seat of the van was covered with blood which he wiped up with a towel prior to picking up Peggy from the rehabilitation facility. Barrow also admitted to Peggy that what she smelled in the van on their way home from rehab was the victim. Peggy told an ex-boyfriend about Barrow’s incriminating statements, who then notified the police. Peggy testified that she was with Barrow at a car wash where she witnessed him scrubbing the seats of his van, but Peggy did not convey this information to the police before trial. It also came out during trial — through a detective’s testimony — that Peggy told the police that Barrow told her he wanted to leave the state for what he had done.
Peggy’s credibility was called into question. Peggy said that she spent the night in rehab because she had taken too many Xanax, and she acknowledged that she had a bad memory. On cross-examination, Peggy admitted she was abusing Xanax and alcohol at the time Barrow made the incriminating statements to her. She would also sometimes smoke marijuana while abusing Xanax and alcohol. Despite testifying that she had known the victim since eighth or ninth grade, Peggy appar *830 ently told the police that she had known the victim since fifth grade. Peggy considered the victim to be a “whore” and informed the police that she would break her kneecaps if she was sleeping with Barrow. Also on cross-examination, Peggy admitted that she had previously filed a domestic violence complaint against Barrow for pushing her into a railing — the same railing the victim hit her head on. Peggy was aware that Barrow had obtained a restraining order against her.
A crime scene investigator testified that a presumptive test was administered in several areas of Barrow’s van, indicating the possible presence of blood in the passenger’s seat and door, the driver’s seat, and the screw areas of a cell phone discovered in the back of the van. A screening test of several areas of the front quadrant of the van established that blood, although not visible, was previously present in the seatbelt receptacle area on the passenger’s side, the passenger side’s front console, the dashboard area, the right side of the driver’s seat, the back portion of the driver’s seat, and the right side of the driver’s side floor. The investigator acknowledged that the screening test gives “quite a few false positives” and stated that a screening test involves chemical reactions. Counsel for Barrow then asked if the van was filled with different bottles of chemicals and whether the van was a work van. The investigator responded that the van appeared to be a work van. The investigator was unable to state how long the blood found in the seats had actually been there. No blood stains were detected in the foam rubber underneath the cushions of the seats.
DNA profiles were obtained from the swabbing of three locations within the van: the interior passenger door, the screw hole of the cell phone, and the left side of the passenger seat. At trial, the forensic technician could not confirm the presence of blood on the swabs of the interior passenger door, but the samples from the screw hole of the cell phone and the left side of the passenger seat were identified as coming from blood. The DNA profiles were the same and thus originated from one contributor. For comparative analysis purposes, DNA samples were taken from Barrow, Zack, and the victim’s parents. As testified by the technician, the results of the analysis were as follows: Barrow was excluded as the donor; Zack could not be excluded as the biological child of the DNA donor profile; and the victim’s parents could not be excluded as the biological parents of the DNA donor profile. The technician sent these materials to a professor of biological sciences, who after evaluating the information and applying a kinship identity analysis, concluded that the victim was the donor of the DNA profiles found in the three stains taken from Barrow’s van. No fingerprint evidence was offered at trial.
Barrow was interviewed by the police. These interviews were recorded, and the State published two recorded interviews to the jury. Defense counsel objected to the playing of the recordings, asserting that the corpus delicti of murder had not been proven by the State. The trial judge reserved ruling on both objections.
The first interview occurred one week after Barrow’s party. Barrow explained in the interview that he last saw the victim the night of the party at around eleven o’clock or midnight when she came to his trailer looking for Peggy. Barrow told the victim that Peggy was in rehab, and then the victim left. According to Barrow, the victim was in his trailer for less than two minutes. He maintained that he never had a sexual relationship with the victim, and he denied going to the victim’s trailer the night of the party. Barrow expressed *831 his dislike for the victim because she had offered Xanax to Peggy even though she was aware of Peggy’s pill problem.
The second recorded interview of Barrow took place nine days after the first interview. In the period between the two interviews, Peggy’s ex-boyfriend informed the police of Barrow’s incriminating statements. The police spoke with Peggy earlier in the day before Barrow was interviewed for the second time.
Barrow stated during the second interview that the victim was not at his party, although she came to his trailer once looking for Zack, and another time, around midnight, looking for Peggy. The latter occurrence was the last time Barrow saw the victim and she left by herself after she was informed that Peggy was in rehab. Later in the interview, Barrow disclosed that when the victim came over to his trailer for the first time the night of the party, she went on a “beer run” with him and Dave Barrow. Barrow admitted he was drunk at his party. After initially denying that the victim had ever made advances toward him, Barrow later said that on three prior occasions the victim had done so, but maintained that the victim did not attempt to do so the night of his party. Barrow did tell Peggy that the victim had made advances toward him in the past. Barrow described the victim as a “slut,” and he was upset that the victim would bring pills to Peggy. At first Barrow stated that he did not remember having a conversation with Peggy about the victim, but then said that he and Peggy only made comments concerning her sexual habits.
Before the State rested, the trial judge found that the State had established the corpus delicti of murder. The defense did not present a case. The jury then retired to deliberate.
Ten minutes into deliberations, the jury submitted a note to the court requesting “all the transcripts of the witnesses’ testimonies, Zack, Shannon, Peggy, Mark Jones, Mark Barrow.” The trial judge informed the lawyers that because there were no transcripts, the court would tell the jury that “there are no transcripts.” The State then suggested that the trial judge advise the jury that they could request read-backs, but the trial judge said, “No, I don’t do read backs.” The trial court explained that case law establishes that the jury is not entitled to a read-back because the issue is within the broad discretion of the trial court. The trial court specifically found that allowing read-backs would be impractical. After informing the attorneys that the court intended to submit a response to the jury stating that “there are no transcripts, please rely on your own recollection of the proceedings,” counsel for Barrow asked the judge to instruct the jurors that they have a right to ask the court for a read-back. That request was denied.[2] The trial court’s written response to the jury read as follows: “There are no transcripts available for your review. Please rely on the evidence presented during the proceedings.” Hours later, the jury found Barrow guilty of first-degree murder. The court sentenced Barrow to life imprisonment.
Barrow appealed his first-degree murder conviction to the Fourth District Court of Appeal, where he first argued that the trial court abused its discretion in its handling of the jury’s request for transcripts. Barrow v. State, 27 So.3d 211 (Fla. 4th DCA 2010). In addressing this claimed er *832 ror, the district court noted that trial courts have “wide latitude in the area of the reading of testimony to the jury” pursuant to Florida Rulé of Criminal Procedure 3.410. Id. at 216 (quoting Avila v. State, 781 So.2d 413, 415 (Fla. 4th DCA 2001)). The district court went on to discuss the Fifth District Court of Appeal’s decision in Roper v. State, 608 So.2d 533 (Fla. 5th DCA 1992), as well as its prior decision in Avila. Barrow, 27 So.3d at 217.
In Roper, in responding to the deliberating jury’s request to “see” the victim’s cross-examination, the trial court told the jury that a transcript had not been produced and instructed it to rely on its collective recollection. Roper, 608 So.2d at 533-34. On appeal, the Fifth District rejected the State’s contention that if a jury requests to see a transcript but not to have testimony read back, a trial court does not abuse its discretion instructing the jury to rely upon its recollections. Id. at 535. The Fifth District reasoned that trial court’s response
may well have led the jury to conclude that their only recourse was to rely upon their “collective recollections and remembrances” as to the cross-examination, of the minor.... At the very least, the trial judge should have apprised the jury that a method was available to have the cross-examination, or specific portions of it, read to them.
Id. Unable to find that the trial court’s refusal to even consider the reading of this testimony was harmless, the Fifth District reversed and remanded the case for a new trial. Id. at 536.
In Avila, the jury requested to “review the timing of specific events set forth by the testimonies of four named alibi witnesses.” 781 So.2d at 414. The trial judge informed the jury that there were no transcripts available and instructed the jury to rely upon its collective recollection. Id. at 415. In reviewing that response, the Fourth District stated that the trial court “without mentioning that a method of readback was available, informed the jury that there were no transcripts and that the jury members should rely upon their collective recollection.” Id. at 415-16 (emphasis added). The Fourth District held that the trial court abused its discretion because the response “may have confused the jury as to whether a readback of testimony was permissible.” Id. at 416.
In addition to discussing Roper and Avila, the district court below explained the contrary decision from the Third District in Hazuri. 27 So.3d at 218. In Hazuri, the Third District held that the trial court’s instruction to the jury to “rely on their own recollection of the evidence” was a “fair and legally accurate” response to the jury’s request for trial transcripts.1 23 So.3d at 858. In concluding that the trial court did not abuse its discretion, the Third District specifically found that the trial court was under no obligation to tell the jury that a read-back might be available upon request. Id. at 859-60.
The Fourth District below in Barrow found the Roper and Avila decisions to be “more in harmony with Florida’s view of a jury’s role in a criminal trial.” 27 So.3d at 218. The district court explained:
Florida law encourages a jury to make a considered, careful evaluation of detailed evidence. As the Supreme Court has written, the “jury has a perfect right to return to the court room at any time and ask questions that are calculated to shed light on the controversy or that will in any way assist it or the court in developing the truth of the controversy.” Sutton v. State, 51 So.2d 725, 726 (Fla.1951). Part of a trial judge’s role is to forthrightly make the jury aware of those tools available under the rules of crimi *833 nal procedure that will assist the jury in arriving at its decision. The judge’s role is to facilitate careful deliberation. Deference should be accorded to a jury’s request to more closely examine the trial testimony.
Id. The district court found that the trial judge’s response to the jury’s request for transcripts that no transcripts were available “effectively negat[ed] an option allowed the jury under Rule 3.410.” Id. (quoting Roper, 608 So.2d at 535). The district court held that the trial court abused its discretion because it denied the jury’s request for transcripts without informing the jury about the potential for read-backs of witnesses’ testimony. Id. at 213. Accordingly, the district court certified conflict with Hazuri. Id. at 218.[3] The district court observed that the jury sought to review the trial transcripts of key witnesses who attended Barrow’s party on the night in question, as well as the transcript of Peggy, who testified as to the incriminating statements allegedly made to her by Barrow. Id. at 219. In addition, the jury was interested in reviewing the statements Barrow had made to the police. Id. Noting the conflicting evidence presented in a case where details were crucial, the district court found that the error committed by the trial court was not harmless, and accordingly, reversed and remanded the case for a new trial. Id. at 213, 219.[4]
The State filed a notice to invoke this Court’s discretionary jurisdiction on the basis of certified conflict. This Court accepted jurisdiction.
ANALYSIS
The issue before us is whether the trial court abused its discretion in failing to inform the jury of the possibility of a read-back when it denied the jury’s request for transcripts. We recently decided Hazuri v. State, 91 So.3d 836 (Fla.2012), which involved a jury’s general request for trial transcripts during deliberations; the jury did not expressly request a “read-back.” Id., 91 So.3d at 840. In response to the jury’s request, the trial court instructed the jury to rely on its own collective recollection of the evidence. Id., 91 So.3d at 839-40. On appeal, the Third District found the response “fair and legally accurate,” and therefore held that the trial court did not abuse its discretion. Id.
In deciding whether the trial court’s response to the jury’s request constituted error, we noted that physical transcripts are prohibited in the jury room as *834 it is omitted from the list of items specified in Florida Rule of Criminal Procedure 3.400,[5] whereas read-backs are authorized pursuant to Florida Rule of Criminal Procedure 3.410, which provides as follows:
After the jurors have retired to consider their verdict, if they request additional instructions or to have any testimony read to them they shall be conducted into the courtroom by the officer who has them in charge and the court may give them the additional instructions or may order the testimony read to them. The instructions shall be given and the testimony read only after notice to the prosecuting attorney and to counsel for the defendant.
Hazuri 91 So.3d at 840-41. Trial courts have broad discretion in deciding whether to allow a read-back request. Id., 91 So.3d at 840-41 (citing In re Amends, to Fla. Rules of Civil Proa, 967 So.2d 178, 183 (Fla.2007)).
Whether the request is called a transcript request or a “read-back” request, the jury — ordinarily composed of individuals unfamiliar with legal terms of art— clearly has the intention to review trial testimony. Id., 91 So.3d at 845. We stressed that trial courts ought to liberally interpret a jury’s request for transcripts so that it may assist the jury in completing its fact-finding duty. Id., 91 So.3d at 845-46. Thus, we adopted the following two rules in order to give the proper effect to rule 3.410: “(1) a trial court should not use any language that would mislead a jury into believing read-backs are prohibited, and (2) when a jury requests trial transcripts, the trial judge should deny the request, but inform the jury of the possibility of a read-back.” Id.[6] Further, if the jury made a general request for trial transcripts, the trial court must also instruct the jury that any subsequent read-back request shall clarify which portion or portions of trial testimony the jury seeks to review. Id.
We held that the trial court in Hazuri erred in instructing the jury that it was to rely on its own recollection of the evidence without informing the jury of its right to request a read-back, as well as in failing to instruct the jury to clarify its general request for transcripts. Id., 91 So.3d at 846. Because determining the effect of the errors would amount to pure speculation, the trial court committed reversible error, entitling Hazuri to a new trial. Id., 91 So.3d at 846-47 (citing to Johnson v. State, 53 So.3d 1003 (Fla.2010)). As a result of our holding, we quashed the district court’s decision in Hazuri, and approved of the reasoning of the district courts of appeal in Barrow, Avila, and Roper. Id., 91 So.3d at 847.[7]
In the instant case, during deliberations, the jury requested transcripts pertaining to the testimonies of Zack, Rasmussen, Peggy, Jones, and Barrow. In response, the trial court told the jury that there were no transcripts available and instructed the jury to “rely on the evidence presented during the proceedings.” In light of our decision in Hazuri, the trial court improperly (1) used language that may have misled the jury into believing read-backs were prohibited; and (2) informed the jury that there were no tran *835 scripts available without informing the jury of the availability of a read-back request. Notwithstanding that this Court decided Hazuri years after Barrow was tried for murder, the trial court abused its discretion as it was bound to follow the Fourth District’s decision in Avila. See Avila, 781 So.2d at 415-16 (finding the trial court’s instruction to the jurors that there were no transcripts and for them to rely upon their collective recollection without informing them about the potential availability of a read-back was an abuse of discretion because it “may have confused the jury as to whether a readback of testimony was permissible”). Because Barrow’s defense counsel had requested the trial court to inform the jury of the availability of a read-back, this error was preserved for review.[8]
Next, we determine whether the trial court’s abuse of discretion warrants a new trial. During deliberations, the jury’s transcript request listed specific witnesses whose testimonies it sought to review. “When a specific request from the jury to read back testimony is at issue, a reviewing court is able to conduct a harmless error analysis.” Johnson, 53 So.3d at 1006 n. 4. Because a jury seeks to review trial testimony whether the request is characterized as a request for a trial transcript or for a “read-back,” it must follow that an improper denial of a jury’s request for trial transcripts of the testimonies of specific witnesses is also subject to a harmless error analysis. The harmless error test requires the State “to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict.” Ventu-ra v. State, 29 So.3d 1086, 1089 (Fla.2010) (quoting State v. DiGuilio, 491 So.2d 1129, 1138 (Fla.1986)).
Applying the harmless error test, it is significant here that the testimonies sought to be reviewed by the jury included the testimonies from the only witnesses at trial who saw the victim the night of Barrow’s party, as well as Barrow’s own statements made to the police. Because the testimonies of these witnesses conflicted on certain points, a review of the testimonies could have been most helpful to the jury. Undoubtedly, Peggy’s testimony was the most damaging because she said that Barrow admitted to her that he killed the victim and disposed of her body. A review of Peggy’s testimony, and its inherent conflicts and questionable statements, would have been helpful to the jury’s determination of her credibility. Peggy admitted that at the time Barrow allegedly made the incriminating statements, she was abusing alcohol and Xanax, which, in her words, “makes you forget.” Furthermore, Peggy testified that she had previously accused Barrow of domestic battery, including an accusation that he pushed her, causing her to hit her head against a railing — an incident similar to the alleged altercation between Barrow and the victim. Peggy also acknowledged that Barrow had obtained a restraining order against her. Based on the quality of the testimonies presented at trial, and the fact that witness credibility was extremely important in this case, we cannot conclude beyond a reasonable doubt that the absence of a review of the testimonies sought by the jury did not contribute to the guilty verdict. Finding the error was not harmless, we conclude that Barrow is entitled to a new trial.[9]
*836 CONCLUSION
For the reasons expressed above, we approve the decision of the Fourth District in this case.
It is so ordered.
LEWIS and PERRY, JJ., concur.
CANADY, C.J., concurs in result.
POLSTON, J., dissents with an opinion.
PARIENTE and LABARGA, JJ., recused.

. By the time of trial, Peggy's last name had changed to Reedy.

. The trial judge considered giving the jury the tapes of Barrow's statements to the police, but defense counsel did not agree.

. As to the trial judge’s statement to counsel that he "do[es]n’t do read backs,” the Fourth District noted, "It is an abuse of discretion for a trial judge to refuse to exercise discretion, to rely on an inflexible rule for a decision that the law places in the judge’s discretion.” Id. at 218. The district court found that the lower court's "apparent adoption of an ad hoc rule prohibiting read backs amounted to a failure to exercise the discretion granted to trial judges in this area.” Id. at 213.

. In addition to the read-back issue, Barrow argued in the district court that his alleged confession — which came by way of Peggy’s testimony — was improperly admitted because the State had failed to establish corpus delicti at trial. See id. In addressing this issue, the district court explained that in order to satisfy corpus delicti in a homicide, the State must prove: "(1) the fact of death; (2) the criminal agency of another person as the cause thereof; and (3) the identity of the deceased person.” Id. at 220 (quoting Meyers v. State, 704 So.2d 1368, 1369 (Fla. 1997)). Ultimately, the district court found that corpus delicti had been established, based on the following evidence presented: (1) the victim had not taken her identification, money, and other belongings with her; (2) three years had transpired between the night of Barrow’s party and the murder trial; (3) the victim was last seen with Barrow; (4) the victim’s blood was discovered in Barrow’s van; and (5) the story Barrow told changed and was contradicted by witnesses at trial. Id.

.A copy of the charges, verdict forms, and all things received in evidence (other than depositions) are permitted in the jury room, while jury instructions must be taken into the jury room. Fla. R.Crim. P. 3.400(a)-(b).

. If thereafter a read-back is requested by the jury, the granting of such is still within the trial court’s broad discretion.

. We also approved of Judge Cope's dissent in Hazuri. Id.

. As noted earlier, at trial the State also suggested that the trial court inform the jury that it could request a read-back.

. We do not decide whether the trial judge’s statement, "I don’t do read backs” was a refusal to exercise discretion which constituted error. See Steinmann v. State, 839 So.2d 832, 832 (Fla. 4th DCA 2003) ("It is error for *836 the trial court to refuse or fail to exercise its discretion.”). In addition, we also refrain from deciding whether the corpus delicti of murder was established in the instant case, but do note that the State was required to show: "(1) the fact of death; (2) the criminal agency of another person as the cause thereof; and (3) the identity of the deceased person.” Meyers v. State, 704 So.2d 1368, 1369 (Fla. 1997).