NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING
MOTION AND, IF FILED, DETERMINED

IN THE DISTRICT COURT OF APPEAL

OF FLORIDA

SECOND DISTRICT


PHILIP MORRIS USA, INC.; R.J. )
REYNOLDS TOBACCO COMPANY; )
LORILLARD TOBACCO COMPANY; )
and LORILLARD, INC., )
)
        Appellants, )
)
v. )        Case No. 2D15-5055
)
KEVIN DUIGNAN, as personal )
representative of the Estate of )
Douglas Clarence Duignan, deceased, )
)
        Appellee. )
_____)

Opinion filed November 15, 2017.

Appeal from the Circuit Court for Pinellas
County; Jack Day, Judge.

Cathy A. Kamm, Terri L. Parker, Daniel F.
Molony, and Razvan Axente of Shook,
Hardy & Bacon, L.L.P., Tampa; Geoffrey
J. Michael and Daphne O'Connor of Arnold
& Porter LLP, Washington, District of
Columbia; Gregory G. Katsas of Jones Day
(withdrew after briefing), Washington,
District of Columbia; and Charles R.A.
Morse of Jones Day, New York, New
York, for Appellants.

David J. Sales, Daniel R. Hoffman of
David J. Sales, P.A., Jupiter; Gary M.
Paige, Robert E. Gordon of Gordon &
Doner, P.A., Davie; James W. Gustafson,

Jr. of Searcy Denney Scarola Barnhart & Shipley, P.A., Tallahassee, for Appellee.

SALARIO, Judge.

Philip Morris USA, Inc. (PM) and R.J. Reynolds Tobacco Company (Reynolds) appeal from a final judgment entered in favor of Kevin Duignan, the personal representative of the Estate of Douglas Clarence Duignan (the Estate).[1] Douglas Duignan smoked cigarettes made by PM and Reynolds and later died of cancer, which led to the filing of this Engle[2] progeny suit by the Estate. We reverse and remand for a new trial primarily because in responding to a note from the jury concerning the testimony of Dennis Duignan, the decedent's brother and an important witness for the defense, the trial court gave an answer improperly calculated to prevent the jury from requesting a readback of that testimony. With respect to the Estate's claims for fraud by concealment and conspiracy to commit fraud by concealment, we further conclude that the trial court erroneously instructed the jury on the element of detrimental reliance.

### The Trial Of This Engle Progeny Case

Background. For the benefit of the reader unfamiliar with tobacco litigation in Florida, Engle progeny cases differ from ordinary product defect or wrongful death cases in that they go to trial with certain factual matters having been conclusively established as a result of the supreme court's decision in Engle v. Liggett Group, 945

---

[1]Lorillard Tobacco Company is also named as an appellant here. Lorillard, however, has been merged into Reynolds, and Reynolds' liability in this case includes liability as a successor-by-merger to Lorillard.

[2]Engle v. Liggett Grp., 945 So. 2d 1246 (Fla. 2006).

So. 2d 1246 (Fla. 2006). Engle was a class action brought against several tobacco companies—PM and Reynolds included—on behalf of Florida-resident smokers who developed smoking-related illnesses caused by addiction to cigarettes containing nicotine. Trial verdicts established liability, compensatory damages for the class representatives, and the entitlement to and the amount of punitive damages for the class. The tobacco companies appealed, and the case reached the Florida Supreme Court. The supreme court decertified the class and vacated the punitive damages award—with the result being that individual members of the Engle class must pursue individual damages actions in order to recover for smoking-related illnesses. Id. at 1254.

Although it decertified the class, the supreme court nonetheless held that certain liability findings—so-called Phase I findings—made by the Engle jury could stand and govern in individual actions by Engle class members. Id. at 1254-55. The retained Phase I findings include findings that smoking cigarettes causes certain diseases (including lung cancer), that nicotine is addictive, that the tobacco companies placed cigarettes on the market that were defective and unreasonably dangerous, that the tobacco companies were negligent, and that the tobacco companies concealed or omitted material information about the health effects and addictive nature of cigarettes and also conspired with one another to do so. Id. at 1257 n.4, 1276-77. To take advantage of these findings in an individual suit, a plaintiff must establish membership in the Engle class by proving that before November 21, 1996, the plaintiff had developed one of the illnesses found by the Engle jury to be caused by smoking and that the plaintiff's illness was caused by an addiction to cigarettes containing nicotine.

Id. at 1256, 1277. If an individual plaintiff demonstrates class membership, the retained Phase I findings are taken as conclusively established for purposes of the individual's action. Id. at 1277.

This particular Engle progeny case proceeded to trial on an amended complaint which alleged that before November 21, 1996, Douglas Duignan developed lung cancer as a result of having been addicted to cigarettes containing nicotine. It asserted claims for strict liability, negligence, fraud by concealment, and conspiracy to commit fraud by concealment and sought compensatory and punitive damages. The Estate acknowledged that Douglas Duignan bore some responsibility for his smoking and asked for an apportionment of fault and damages on his nonintentional tort claims—i.e., the claims for strict liability and negligence.

The trial evidence. The trial court held a two-phase trial. The first phase was to determine the issues of Engle class membership, comparative fault, legal causation on the Estate's fraud and conspiracy claims, and the Estate's entitlement—if any—to punitive damages. The Estate presented evidence that Douglas Duignan began smoking at fourteen and had become a regular smoker by his midteens. It also presented evidence that he exhibited behaviors consistent with nicotine addiction, that he made several unsuccessful attempts to quit smoking, and that he smoked light and filtered cigarettes because he believed them to be safer alternatives. In 1992, when he was forty-two years old, doctors discovered a cancerous tumor in Douglas Duignan's lung and later found that there was cancer elsewhere in his body. He died thereafter.

As to the fraud and conspiracy claims, the Estate put on evidence that PM and Reynolds, together with many other tobacco companies, conspired over several

- 4 -

decades to conceal what they knew about the addictive properties and health effects of smoking cigarettes. This included evidence of tobacco company advertising that depicted cigarette smoking as glamorous and even healthy, the tobacco companies' creation of a false controversy in the public debate designed to prolong doubt as to the addictive properties and health effects of cigarette smoking, the promotion of the idea that smoking light and filtered cigarettes reduced the risks associated with smoking, and internal tobacco company documents showing what the tobacco companies actually knew about nicotine addiction and smoking-related disease.

PM and Reynolds' defense, in contrast, focused substantially on a theory that Douglas Duignan smoked because he liked smoking rather than because he was addicted to nicotine or because he was misinformed about the risks. This theory put the following items at issue: (1) Engle class membership (Douglas Duignan's affinity for smoking, rather than his addiction to cigarettes, was the legal cause of his cancer), (2) legal causation on the fraud and conspiracy claims (he knew the material health risks of smoking and did not rely on any concealed or omitted facts), and (3) comparative fault (his decision to keep smoking was his own).

PM and Reynolds put on evidence that significant information about the adverse consequences of cigarette smoking generally was known to the public and specifically was known to Douglas Duignan from the time he began smoking. They also offered the testimony of Dennis Duignan, who lived in Washington State. Although he did not appear in person at trial, portions of his deposition testimony were read to the jury as evidence by the parties, with the trial lawyers playing the parts of questioner and witness. Dennis Duignan testified that he and his brother referred to cigarettes using

slang terms including "cancer sticks" and "coffin nails." He further testified about a conversation with his brother that occurred sometime in the 1970s, during which Douglas Duignan said that his doctor had told him "that if he didn't quit smoking, he'd be dead in five years." When Dennis Duignan asked his brother whether he planned to quit, Douglas Duignan replied that he did not plan to quit because he liked smoking. The Estate questioned both the veracity of this testimony and the timing of the conversation. Both sides addressed it in opening statements and closing arguments.

The instructions on fraud and concealment. At the close of the trial, the jury was instructed to determine whether Douglas Duignan was a member of the Engle class and, if he was, that it "must accept [certain] previously determined matters as true . . . just as if you had determined them yourselves." A finding that Douglas Duignan was a member of the Engle class coupled with the preclusive effect of the retained Phase I findings on strict liability and negligence resolved the Estate's claims for strict liability and negligence, with the exception of the issues of comparative negligence and damages, as to which the jury was also instructed.

As relevant to the claims for fraud and conspiracy, the jury was instructed that the retained Phase I findings conclusively established both that PM and Reynolds each "concealed or omitted material information" about the adverse effects of smoking and also that they "entered into an agreement" with other tobacco companies "to conceal or omit information" regarding those matters. Those findings alone did not resolve the claims for fraud and conspiracy, however, and the jury was required to determine legal causation, which centered on the issue of detrimental reliance.

- 6 -

PM and Reynolds requested an instruction that required the jury to find that Douglas Duignan detrimentally and reasonably relied on "a statement" by each of them (with respect to the fraud claim) and by a member of the conspiracy (with respect to the conspiracy claim) and that such reliance was the cause of his cancer. The trial court rejected that instruction and gave the jury a different special instruction concerning the reliance element of the fraud claim:

> The issue for your determination on Plaintiff's claims for concealment is whether the concealment or omission of material information regarding the health effects of cigarettes or their addictive nature by [PM and Reynolds] was a legal cause of Douglas Duignan's lung cancer <u>because Mr. Duignan reasonably relied to his detriment that [PM and Reynolds] would not conceal or omit disclosure of such material information</u>.

(Emphasis added.) The court gave a similar special instruction with respect to the conspiracy claim:

> The next issue for your determination will be whether the agreement to conceal or omit material information previously described was a legal cause of Douglas Duignan's lung cancer <u>because Mr. Duignan reasonably relied to his detriment that [PM and Reynolds] would not conceal or omit disclosure of such material information either alone or in conjunction with others</u> . . . .

(Emphasis added.)

<u>The jury note</u>. During its Phase I deliberations, the jury sent the court a note about how to locate specific portions of the evidence to review, asking as follows: "Is there a key for the evidence? We are having trouble finding things in the evidence boxes. If not, can we have the number for Dennis Duignan's deposition?" During a discussion with counsel over a potential response to this question, the parties and court considered whether and how to advise the jury about the possibility that the deposition

testimony read to the jury during the trial could be read back to the jury upon request. The trial court expressed concern that allowing a readback of Dennis Duignan's testimony would open a "Pandora's box" and perhaps give "undue influence" to that testimony. The trial court proposed to instruct the jury that "[t]estimony is not generally read back to a jury. There is a possibility under some circumstances." PM and Reynolds objected to that instruction and proposed simply advising the jury that a readback was possible.

The court declined. It brought the jury in, explained that no transcript was available, and told the jury as follows:

> [T]here's sort of a magic that happens with the six of you putting your recollections together, it's called collective recollection, and you are urged, in regard to all testimony in the case, to use your collective recollection.
>
> It is not impossible to read testimony back to a jury, but it is not generally done. And part of that is to—so that no witness's testimony gets a—more focus or attention than anybody's, gets undue emphasis that way.

The verdicts and judgment. The jury then returned a verdict that, in essence, determined that Douglas Duignan was a member of the Engle class and found in the Estate's favor on all claims. It awarded $6,000,000 in compensatory damages and found that the Estate was entitled to punitive damages. It apportioned fault as follows: 37% to PM, 30% to Reynolds, and 33% to Douglas Duignan. After the second phase of the trial, the jury awarded punitive damages of $3.5 million against PM and $2.5 million against Reynolds.

The trial court entered a judgment against PM and Reynolds finding them jointly and severally liable for the entire compensatory damage award, irrespective of

the jury's comparative fault allocation, because the Estate had prevailed on its intentional tort claims and damages on such claims are not apportioned based on comparative fault. PM and Reynolds requested that the trial court apply a credit to the punitive damages award based on a "Guaranteed Sum Stipulation" entered into by the parties in the original Engle litigation regarding the punitive damage award in that case. The trial court denied that request, and its judgment included the punitive damages awards the jury made. PM and Reynolds timely appeal the judgment.

### The Issues On Appeal

PM and Reynolds raise four issues.[3] First, they assert that the trial court's response to the jury note concerning Dennis Duignan's testimony both improperly discouraged the jury from requesting a readback and, by advising the jury that a readback would give "undue influence" to the testimony, improperly commented on the evidence. Second, they argue that the trial court's instructions to the jury on the reliance element of the Estate's fraud-based claims were erroneous because they failed to require the jury to find that Douglas Duignan relied on "a statement" by one of the tobacco companies. Third, they claim that the trial court erred by failing to reduce the compensatory damages award based on the jury's comparative fault allocation because Engle progeny cases are grounded in negligence, not intentional torts, and principles of

---

[3]They also seek to preserve for review in the United States Supreme Court their arguments that it violates due process to allow an Engle progeny plaintiff to establish the conduct elements of his or her claims and that federal law impliedly preempts strict liability and negligence claims based on the Engle findings. The first of those arguments was rejected by the Florida Supreme Court in Philip Morris USA, Inc. v. Douglas, 110 So. 3d 419, 430-36 (Fla. 2013), and the second was rejected by the Florida Supreme Court in R.J. Reynolds Tobacco Co. v. Marotta, 214 So. 3d 590, 605 (Fla. 2017).

- 9 -

comparative fault therefore apply notwithstanding the Estate's assertion of claims for fraud by concealment and conspiracy. And fourth, they contend that they are entitled to a credit against the punitive damage award based on the Guaranteed Sum Stipulation between the tobacco companies and the Engle class in the original Engle litigation.

After oral argument in this case, this court issued an opinion in another case deciding the issues of whether comparative fault applies when an Engle defendant is found liable for intentional torts and whether the Guaranteed Sum Stipulation in the original Engle litigation requires application of a credit to a punitive damages award adversely to PM and Reynolds. See Philip Morris USA Inc. v. Boatright, 217 So. 3d 166 (Fla. 2d DCA 2017), appeal filed, No. SC17-894 (Fla. May 12, 2017). We therefore find no merit in PM and Reynolds' third and fourth issues. As to the third issue concerning comparative fault, we certify conflict, as we did in Boatright, with R.J. Reynolds Tobacco Co. v. Schoeff, 178 So. 3d 487 (Fla. 4th DCA 2015), review granted, No. SC15-2233, 2016 WL 3127698, *1 (Fla. May 26, 2016), and the line of cases relying on it.[4] We further address PM and Reynolds' first two issues concerning the readback and the reliance instructions below.

### *The Trial Court's Readback Instruction*

We review a trial court's decision regarding readbacks of trial testimony for abuse of discretion, State v. Barrow, 91 So. 3d 826, 835 (Fla. 2012), and we also apply that standard to review a trial court's response to a jury question, Cannon v. State, 180

---

[4]Philip Morris USA Inc. v. McKeever, 207 So. 3d 907 (Fla. 4th DCA 2017); R.J. Reynolds Tobacco Co. v. Grossman, 211 So. 3d 221 (Fla. 4th DCA 2017); R.J. Reynolds Tobacco Co. v. Calloway, 201 So. 3d 753 (Fla. 4th DCA 2016), review denied, No. SC16-1937, 2017 WL 1023712, *1 (Fla. Mar. 16, 2017), cert. denied, No. 16-1507, 2017 WL 1023712 (Oct. 2, 2017).

So. 3d 1023, 1036 (Fla. 2015). The trial court's response in this case—that although a readback was "not impossible," it "is not generally done" and that the jury should rely on its "collective recollection"—was an abuse of discretion because it was calculated to prevent the jury from asking for a readback and thereby interfered with the jury's ability to discharge its duties as the finder of fact in this case.[5]

The leading case on readbacks of trial testimony in Florida is Hazuri v. State, 91 So. 3d 836 (Fla. 2012). In Hazuri, a jury in a criminal trial sent the judge a note asking to see trial transcripts. The defendant argued that the right response to the request was to tell the jury that transcripts were not available but that it could have read back to it whatever testimony it wanted. The trial court disagreed and told the jury only that transcripts were not available and that it should rely on its "collective recollection" of the evidence to decide the case. Id. at 839. The defendant appealed his subsequent conviction, arguing that the trial court erred when it refused to tell the jury that it could have parts of the transcript read back. After the Third District affirmed, Hazuri v. State, 23 So. 3d 857 (Fla. 3d DCA 2009), the supreme court accepted jurisdiction.

The supreme court quashed the Third District's decision and held that the trial court abused its discretion in failing to inform the jury of its right to request a readback. 91 So. 3d at 846-47. It began by observing that the jury did not request a readback—it only requested transcripts—but decided that the trial court was required to inform the jury of the possibility of a readback nonetheless. Id. at 845. It tethered this holding to the core function of the jury, explaining that "the role of a jury as a factfinder

---

[5]To the extent the Estate contends that this error was either unpreserved or waived, the contention is, on our review of the record, without merit.

- 11 -

is of utmost importance" and that "a jury cannot properly fulfill its constitutionally mandated role if it cannot recall or is confused about the testimony presented in a case." Id. Because "[a] jury is composed of laypersons often unfamiliar with legal terms of art," the court explained, "there should be no magic words required for a read-back request." Id. "Failing to require further instruction concerning a read-back after a jury has requested transcripts leaves the jury without the means to refresh its memory of witness testimony—testimony that could be critical to the outcome of the verdict." Id.

The court thus adopted "the following two rules: (1) a trial court should not use any language that would mislead a jury into believing read-backs are prohibited, and (2) when a jury requests trial transcripts, the trial judge should deny the request, but inform the jury of the possibility of a read-back." Id. at 846; see also Barrow, 91 So. 3d at 834 (restating rules announced in Hazuri). "A trial judge can respond to a request for transcripts in the following manner: 'Transcripts are not available, but you can request to have any testimony read back to you, which may or may not be granted at the court's discretion.' " Hazuri, 91 So. 3d at 846.

We recognize that Hazuri is a criminal case, as are the vast majority of published decisions on readbacks in Florida. We also recognize that readbacks in criminal cases are expressly regulated by rule 3.410 of the Florida Rules of Criminal Procedure, see Hazuri, 91 So. 3d at 844, to which the civil rules contain no analog. At the time Hazuri was decided, rule 3.410 contained a one-sentence, discretion-conferring provision that a trial court "may" read back trial testimony to a jury.[6] Fla. R. Crim. P.

---

[6]The criminal rule has since been amended to regulate a trial court's communication with a jury concerning readbacks in more detail and in a manner consistent with Hazuri. See Fla. R. Crim. P. 3.410 (2017). Although adoption of a

3.410 (2012); see also Avila v. State, 781 So. 2d 413, 415 (Fla. 4th DCA 2001) (holding

that rule 3.410 confers "wide latitude in the area of the reading of testimony to the jury"),

approved by Hazuri, 91 So. 3d at 847.

Those distinctions do not, however, mean that Hazuri should not apply in

civil cases.  Although no rule of procedure governs readbacks in the civil context, a trial

judge in a civil case must, to carry out his or her responsibility to order and facilitate the

jury's deliberations, enjoy a similar discretion about readbacks to that given a trial judge

in a criminal case under rule 3.410.  See Broward Cty. Sch. Bd. v. Ruiz, 493 So. 2d 474,

479-80 (Fla. 4th DCA 1986) (noting that no rule of civil procedure governs readbacks

but analogizing to rule 3.410); see also Fla. Std. Jury Instr. (Civ.) 801.2, note 1 ("In civil

cases, the decision to allow read-back of testimony lies within the sound discretion of

the trial court.").  As such, our analysis of a trial court's readback decisions in a civil

case starts in the same place as it would in a criminal case: the trial court's ability to

permit or reject a request for a readback in its discretion based on the facts and

circumstances of the case.

Moreover, in deciding to regulate what a trial judge should and should not

say about the jury's ability to ask the trial judge to allow a readback, Hazuri relied on

---

similar civil rule to address readbacks was contemplated, no changes to the civil rules
were made; instead, a standard jury instruction in civil cases to govern the discretion
afforded a trial court when a jury requests a readback was adopted.  In re Amendments
to the Fla. Rules of Civil Procedure, 967 So. 2d 178, 183 (Fla. 2007).  Following Hazuri,
the standard civil readback instruction, Fla. Std. Jury Instr. (Civ.) 801.2, which contains
an express statement for the trial court to use in addressing jury requests for readbacks,
was amended to include a note to reflect some limits on the trial court's discretion
similar to those in the criminal context.  In re Standard Jury Instructions in Civil Cases-
Report No. 12-02, 115 So. 3d 208, 209 (Fla. 2013).  Although the trial court
acknowledged that this standard instruction existed, it did not employ it in responding to
the jury note in this case.

considerations that are also present in the civil context.  In particular, the court emphasized the jury's constitutional provenance and its centrality in determining facts when they are the subject of dispute.  Hazuri, 91 So. 3d at 845.  Both considerations are implicated in civil cases as well.  See amend. VIII, U.S. Const.; art. I, § 22, Fla. Const.  A jury in a civil case is thus no more able to "properly fulfill its constitutionally mandated role if it cannot recall or is confused about the testimony presented," see Hazuri, 91 So. 3d at 845, than a jury in a criminal case is.  Because Hazuri's rules concerning the possibility of a readback when transcripts are requested seek to ameliorate that confusion and permit the jury to perform its core function as a trier of fact, we see no reason why those rules should not be applied in civil cases as well.

In this case, the trial court's response to the jury note seeking a transcript of Dennis Duignan's testimony, at a minimum, violated Hazuri's rule that a trial court should not use language that would mislead a jury into believing that a readback is prohibited.  To be sure, the trial court did not explicitly say that a readback was prohibited; indeed, it acknowledged that a readback was "not impossible."  But whether the trial court did or did not say that a readback was prohibited is not the question Hazuri asks.  The question is whether what the trial court did say "would mislead" a jury into believing that a readback was prohibited.  Hazuri, 91 So. 3d at 846; see also Roper v. State, 608 So. 2d 533, 535 (Fla. 5th DCA 1992) (finding error where "the trial judge's response to the jury's question may well have led the jury to conclude" that a readback was prohibited), approved by Hazuri, 91 So. 3d at 847.  The focus, then, is on what the likely effect of the trial court's statements on a reasonable jury might have been.  Here, the answer is that a reasonable jury would have thought a readback prohibited.

- 14 -

Four facets of the trial court's response to the jury note inform that conclusion. First, the trial court advised the jury that readbacks, although "not impossible," are "not generally done." Second, it told the jury that the reason readbacks are "not generally done" is to prevent any witness's testimony from having undue influence by getting more attention than any other witness's testimony. Third, the trial court never told the jury that it had the option to ask for a readback; in other words, although the trial court said that readbacks are "not impossible," the jury was never told that it had the option to make that which was "not impossible" possible by asking for it. And finally, the court instructed the jury to rely on its "collective recollection" of all of the testimony in the case because of the "magic that happens" when a jury does so.

It takes no feat of imagination to see how this response might lead reasonable lay jurors to think that asking for a readback would be a fool's errand. In substance, the trial court communicated to them that a readback was something extraordinary, that it was extraordinary because it gave the witness whose testimony was read back undue influence, and that the jurors instead should rely on their collective recollection of the testimony. The trial court's remarks, combined with its silence on the jury's right to at least ask for the testimony to be read back, in essence and effect, informed the jurors "that their <u>only</u> recourse was to rely upon their 'collective recollections and remembrances' as to" Dennis Duignan's testimony because transcripts were unavailable and a readback would not be forthcoming. See <u>Roper</u>, 608 So. 2d at 535. That was error. See <u>Avila</u>, 781 So. 2d at 416 (reversing where the trial judge's response to transcript request "may have confused the jury as to whether a readback of testimony was permissible"); <u>Biscardi v. State</u>, 511 So. 2d 575, 581 (Fla.

- 15 -

4th DCA 1987) (reversing where "the judge's words may reasonably have conveyed to the jurors that to ask for . . . rereading of testimony would be futile"), approved by Hazuri, 91 So. 3d at 847.  Based on the trial court's stated concern about reading back Dennis Duignan's testimony, this appears to have been the result its instruction was calculated to produce.

The Estate argues that a Hazuri-type analysis is inapplicable in this case because Hazuri deals with a trial court's response to a jury's request to see a transcript of trial testimony, and the jury here sought only a transcript of Dennis Duignan's deposition testimony.  That distinction might be material in other cases—we need not discuss it—but it is not in this one.  Here, Dennis Duignan's deposition testimony was his trial testimony.  It was read by the lawyers to the jury as substantive evidence at the trial.  When deposition testimony is presented in this way, it is presented "as though the witness was present and testifying" in person at the trial.  Castaneda v. Redlands Christian Migrant Ass'n, 884 So. 2d 1087, 1090 (Fla. 4th DCA 2004); see also Fla. R. Civ. P. 1.330(a) (stating that, where authorized by this rule, a deposition may be used "so far as [it is] admissible under the rules of evidence applied as though the witness were then present and testifying").

Because Dennis Duignan's deposition testimony was presented to the jury as his trial testimony, the jury's request for his deposition transcript should have been interpreted as a request for the transcript of the deposition testimony that was read aloud at trial.[7]  See Hazuri, 91 So. 3d at 845 (explaining that because jurors are

---

[7]The cases upon which the Estate relies are not applicable because none involved consideration of a jury's request to examine transcripts of deposition testimony read aloud to the jury during trial as substantive evidence.  See Adams v. State, 122 So.

- 16 -

laypersons, a court should liberally construe a request for transcripts, "especially when the intent of the jury[] . . . is clear").  Indeed, the record in this case reflects that this is precisely how the trial court, the tobacco companies' counsel, and the Estate's counsel interpreted the request at the time it was made.  The rules announced in Hazuri apply to this case.

The Estate also argues that even if the trial court was mistaken in its response to the jury note, any error was harmless.  Trial court error is regarded as harmless when "the beneficiary of the error proves that there is no reasonable possibility that the error contributed to the verdict."  Special v. W. Boca Med. Ctr., 160 So. 3d 1251, 1256-57 (Fla. 2014).

The inferences PM and Reynolds sought to draw from Dennis Duignan's testimony—inferences the testimony reasonably, although not exclusively, supports— were that Douglas Duignan knew early on that cigarettes caused cancer and other diseases and that he continued smoking notwithstanding this knowledge, not because he was addicted but because he did not intend to quit smoking.  These inferences were

3d 976, 978-80 (Fla. 2d DCA 2013) (holding, without discussing whether the depositions were read at trial or the distinction between deposition and trial testimony, that the trial court's failure to inform the jury of the possibility of a readback in response to a request for "all the depositions" and "transcripts of all the testimony" was not remediable on appeal in the absence of a contemporaneous objection in the trial court); Bannister v. State, 132 So. 3d 267, 278-80 (Fla. 4th DCA 2014) (holding that where a jury requested the depositions in a case where trial witnesses read from them during parts of their live testimony, "the jury was not requesting a read-back of the witness's testimony, but rather hard copies of the depositions" themselves); Delestre v. State, 103 So. 3d 1026, 1027-28 (Fla. 5th DCA 2012) (holding that the trial court's failure to inform the jury of the possibility of a readback in response to a request for "all the testimony" was not fundamental error); see also Armstrong v. Dwyer, 155 F.3d 211, 214 (3d Cir. 1998) (involving circumstances where it was clear that "the jury sought transcripts of depositions, rather than transcripts of the deposition testimony read during trial or a readback of such testimony").

significant in this case because they bore directly on PM and Reynolds' argument that Douglas Duignan was not a member of the Engle class because this cancer was not caused by addiction, on their argument that Douglas Duignan was comparatively negligent by continuing to smoke even when he was aware of the risk of cancer and other disease, and on their argument that Douglas Duignan did not rely on any information about addiction or the health effects of smoking that the tobacco companies fraudulently concealed. The Estate and PM and Reynolds addressed Dennis Duignan's testimony in opening statements and again in closing arguments. The fact that the jury asked for a transcript of his testimony suggests that it may have found it significant as well. Under these circumstances, there is at least a reasonable possibility that had the jury been permitted to ask for a readback of Dennis Duignan's testimony, it might have resolved one or more of the determinative issues in the case differently than it ultimately did. See, e.g., Barrow, 91 So. 3d at 835 (concluding that trial court's use of language that may have misled the jury into believing readbacks were prohibited was harmful where the facts showed that "a review of the testimonies could have been most helpful to the jury"); Roper, 608 So. 2d at 536 (holding that, where there were discrepancies between the testimony requested and other testimony in the case, "the trial court's refusal to even consider the reading of this crucial cross-examination" was not harmless).

The trial court abused its discretion in addressing the jury's request for Dennis Duignan's deposition, and the Estate has not met the burden to show that error was harmless. Accordingly, we must reverse and remand for a new trial. In light of this result, we need not further address PM and Reynolds' argument that the trial court also

- 18 -

improperly commented on the evidence in its response to the jury's note. We do, however, address one other issue raised on appeal because it relates to a matter that rests within the scope of our remand and therefore requires our consideration.

### *The Trial Court's Instruction on Reliance*

PM and Reynolds also argue that the trial court erred in instructing the jury on the reliance elements in the claims for fraud by concealment and conspiracy because it failed to tell the jury that Douglas Duignan was required to have relied on "a statement" by PM or Reynolds in order for the Estate to prevail. We review a trial court's decision to give or withhold a jury instruction for abuse of discretion, ITD Indus., Inc. v. Bus. Res. Grp., 779 So. 2d 532, 543 (Fla. 2d DCA 2000), but will find such an abuse of discretion and reverse when an instruction is misleading and may have caused the jury to reach a result it otherwise would not have reached, Citizens Prop. Ins. Corp. v. Salkey, 190 So. 3d 1092, 1095 (Fla. 2d DCA 2016), quashed on other grounds, No. SC16-784, 2017 WL 2709776, at *1 (Fla. June 23, 2017). While we do not read the reliance requirement as narrowly as PM and Reynolds do—we do not think it categorically requires reliance on "a statement"—the instruction in this case was an abuse of discretion because it inaccurately told the jury to determine whether Douglas Duignan generally relied on PM and Reynolds to disclose material facts rather than telling the jury to determine whether he relied on a misapprehension concerning a material fact that PM and Reynolds concealed from him.

Our analysis begins with what the Engle Phase I findings conclusively established in this case. As concerns fraud by concealment, they established that PM and Reynolds "concealed or omitted material information not otherwise known or

- 19 -

available knowing that the material was false or misleading or failed to disclose a material fact concerning the health effects or addictive nature of smoking cigarettes." See Engle, 945 So. 2d at 1257 n.4, 1277. For the conspiracy claims, they established that PM and Reynolds "agreed to conceal or omit information regarding the health effects of cigarettes or their addictive nature with the intention that smokers and the public would rely on this information to their detriment." Id.

The fact that the concealment or omission of material information with the intention that it would be relied on was a given, however, does not mean that it caused Douglas Duignan any harm unless he is shown actually to have relied on it. In a claim founded in fraud, the link between a defendant's conduct and the plaintiff's harm is supplied in part by the requirement that the plaintiff detrimentally and reasonably relied on something the defendant said or failed to say. See Humana Inc. v. Castillo, 728 So. 2d 261, 265 (Fla. 2d DCA 1999) ("If a plaintiff claims to be misled, but cannot demonstrate a causal connection between the defendant's conduct and the plaintiff's misapprehension, the plaintiff cannot recover."); see also Calloway, 201 So. 3d at 766 ("Florida's written opinions have consistently included detrimental reliance as an element in fraudulent concealment instructions."). Thus, it is settled that "Engle-progeny plaintiffs must . . . prove detrimental reliance in order to prevail" on claims for fraudulent concealment and conspiracy to fraudulently conceal. Hess v. Philip Morris USA, Inc., 175 So. 3d 687, 698 (Fla. 2015).

PM and Reynolds say that an Engle progeny plaintiff must show his reliance on a direct statement by a defendant (in the case of fraudulent concealment) or a member of the conspiracy (in the case of conspiracy), but that understanding of

- 20 -

reliance is artificially narrow. It is true that fraud claims are commonly based on an affirmative statement by the defendant and that in such circumstances the law speaks of reliance on a statement or a representation. See, e.g., Butler v. Yusem, 44 So. 3d 102, 105 (Fla. 2010) (discussing reliance on such representations). But the cases' use of the formulation "detrimental reliance on a statement" or something similar should not obscure the nature of the inquiry: when we ask about detrimental reliance, we are asking whether the plaintiff would have behaved in the same way had he known the true facts. See, e.g., Lance v. Wade, 457 So. 2d 1008, 1011 (Fla. 1984) (holding that individual issues of reliance generally preclude fraud class actions because "[w]hat one purchaser may rely on in entering into a contract may not be material to another purchaser"), distinguished on other grounds in KPMG Peat Marwick LLP v. Barner, 799 So. 2d 308, 309 (Fla. 2d DCA 2001). Depending on the facts presented in a claim involving reliance, a statement is not the only way in which the claimant may prove it.

Consider a fraud claim based on an affirmative misrepresentation. A seller of a car tells a buyer that "this car has never been in an accident." In fact, the car has been in five of them. The seller's statement is false. Doubtless, a trial court would properly instruct a jury to determine whether the plaintiff relied on a statement in deciding to buy the car. See, e.g., Fla. Std. Jury Instr. (Civ.) 409.7. But it is the fact that statement conveys—that the car had never been in an accident—that really mattered to the buyer. An instruction that the buyer must prove reliance on a statement is correct because the statement conveys the fact the buyer misapprehended.

In cases involving concealment or omission, however, the link between a statement by the defendant and the plaintiff's misapprehension may be less direct.

Suppose our car seller assured the buyer that "this car's transmission has always worked fine." Suppose also that the statement was literally true but failed to note that the seller had just discovered a defect in the transmission that will become a serious problem within a year. Although the seller's statement was true, the plaintiff might still claim fraud on the theory that having chosen to speak about the condition of the transmission, the seller had a duty to disclose the transmission defect that had not yet manifested itself to the buyer. See, e.g., ZC Ins. Co. v. Brooks, 847 So. 2d 547, 551 (Fla. 4th DCA 2003) ("Florida law recognizes that fraud can occur by omission[] and places a duty on one who undertakes to disclose material information to disclose that information fully."); Mukamal v. Gen. Elec. Capital Corp. (In re Palm Beach Fin. Partners, L.P.), 517 B.R. 310, 335 (Bankr. S.D. Fla. 2013) ("Fraudulent concealment is common law fraud by means of actively concealing a material fact in the fact [sic] of a duty to disclose that fact to the plaintiff."). In this circumstance, the statement itself only expressed the material fact that the transmission had worked fine in the past—a historical fact that may not have mattered to the buyer and, even if it did, cannot have operated to the buyer's detriment because it was true. The buyer here was not misled by the content of a statement; he was misled regarding an unstated truth the seller became obligated to disclose by virtue of having decided to speak. A jury instruction that the buyer must have detrimentally relied on the seller's statement would be appropriate in this circumstance because the seller's statement triggered his disclosure obligation. But it would be more precise to ask whether he relied on a misapprehension as to the fact concealed or omitted.

- 22 -

And then, of course, there can be concealment or omission with no statement at all, such as when the car's seller, knowing the trunk is severely rusted inside, parks the car so as to prevent the buyer from opening it fully and finding the damage.  See, e.g., Restatement (Second) of Torts § 550, cmt. a (Am. Law. Inst. 2016) (providing similar example of fraudulent concealment); see also Joiner v. McCullers, 28 So. 2d 823, 824-25 (Fla. 1947) (explaining that "[t]he rule that fraud cannot be predicated of a failure to disclose facts . . . does not apply where a party[,] in addition to non-disclosure[,] uses any artifice to throw the other party off his guard" or on "any . . . act . . . which tends affirmatively to a suppression of the truth" (quoting 12 Ruling Case Law, Fraud and Deceit § 80, 319-20 (William M. McKinney & Burdette A. Rich, eds. (1916), a now out-of-print legal treatise).  Alternatively, the seller stands in a fiduciary relationship to the buyer and, although obligated by that relationship to make disclosure of the rusted trunk, fails to do so.  See TransPetrol, Ltd. v. Radulovic, 764 So. 2d 878, 880 (Fla. 4th DCA 2000) (holding that a duty of disclosure exists where there is a fiduciary or other relationship of trust and confidence between plaintiff and defendant (quoting State v. Mark Marks, P.A., 654 So. 2d 1184, 1189 (Fla. 4th DCA 1995))).  In either circumstance, it would be inaccurate to instruct a jury to look for reliance on a statement to fulfill the obligation of proof because no statement was made.  The buyer's reliance, if any, was on the mistaken belief that there was nothing wrong with the trunk. In this circumstance, it would be incorrect to instruct the jury that it had to find reliance on a statement because there was not one on which the buyer could rely.

The point of these hypotheticals is not to catalog every variation of the facts upon which a reliance instruction might be given.  It is to show that whether an

instruction that a jury must find reliance on "a statement" is necessary or proper will depend on the nature of the claims presented and the evidence at trial.  See Calloway, 201 So. 3d at 766 (holding, in an Engle progeny case, that "[t]he instruction need not include reliance on 'a statement' unless the facts of the case warrant it").  It also is to show that when the facts involve concealment or omission, an instruction requiring detrimental reliance on a misapprehension as to the fact concealed or omitted will usually accurately inform the jury of what it must find with respect to the element of detrimental reliance essential to that claim.  That is the case here.

PM and Reynolds argue, however, that reliance on "a statement" is necessary in an Engle progeny case because the concealment claim in the original Engle trial was predicated on statements by the tobacco company defendants in that case.  They point to language in the Engle jury instructions showing that the concealment claim hinged on statements that the Engle plaintiffs contended required the tobacco companies to make complete disclosure of what they knew about the health consequences of smoking and to arguments made by Engle class counsel to similar effect.  Assuming for argument's sake that PM and Reynolds have accurately construed the concealment claim litigated in the Engle trial—a matter we need not decide—that still would not command a hard-and-fast rule that an instruction in an Engle progeny case must include a requirement that the plaintiff detrimentally relied on "a statement."

The excerpts of the Engle trial to which PM and Reynolds point depict a theory of concealment based on circumstances in which a defendant has spoken on a subject—i.e., has made a statement about it—and thereby became obligated to make a fuller disclosure and, by failing to do so, concealed or omitted material facts.  As

- 24 -

described above, it is at least equally accurate to say that the plaintiff's reliance must be on a misapprehension as to the material facts or information concealed or omitted by the defendant, rather than on any specific statement it made.

This is consistent with the way Florida courts have evaluated the legal sufficiency of a plaintiff's evidence of reliance in the context of the fraudulent concealment and conspiracy claims in an Engle progeny case. An Engle plaintiff's proof in such cases typically includes, as it did in this case, extensive evidence of the tobacco company defendants' participation in a decades-long pervasive advertising campaign and creation of a false controversy about the addictive nature and health effects of cigarettes that operated to conceal the adverse consequences of smoking from cigarette consumers. In such circumstances, the courts have refused to hold that an Engle progeny plaintiff must identify specific statements that he read or heard and relied upon in making a decision regarding cigarette smoking in order to prevail. See Philip Morris USA, Inc. v. Kayton, 104 So. 3d 1145, 1149 (Fla. 4th DCA 2012), quashed on other grounds, 41 Fla. L. Weekly S113 (Fla. Feb. 1, 2016) (table decision); R.J. Reynolds Tobacco Co. v. Martin, 53 So. 3d 1060, 1069-70 (Fla. 1st DCA 2010). The reason is that the very pervasiveness of the advertising campaign and false controversy and uniqueness of the facts concealed or omitted permits an Engle progeny jury to infer reliance. See Philip Morris USA, Inc. v. Hallgren, 124 So. 3d 350, 353 (Fla. 2d DCA 2013) (discussing Martin, 53 So. 3d at 1069-70). But see Berger v. Phillip Morris USA, Inc., 101 F. Supp. 3d 1228, 1238-39 (M.D. Fla. 2015) (criticizing reasoning of these cases and predicting that the Florida Supreme Court will not follow them), appeal filed, 101 F. Supp. 3d 1228 (11th Cir. Jan. 5, 2016). This is not to say that a tobacco

company cannot show otherwise. Cf. Evers v. R.J. Reynolds Tobacco Co., 195 So. 3d 1139, 1141 (Fla. 2d DCA 2015) (reversing entry of a directed verdict and rejecting defendant's sufficiency challenge on reliance element where "the tobacco company has pointed to no evidence that Ms. Loyd was aware that the nicotine in cigarettes was addictive, nor has it conclusively demonstrated that despite some awareness on Ms. Loyd's part that smoking could cause health problems, that she was not reassured by the controversy the tobacco companies generated to keep people smoking"). But the cases do seem to establish that reliance on "a statement" is not required to prevail in an Engle progeny case.

PM and Reynolds also argue that without an instruction that requires the plaintiff to have relied on a statement, they risk being held liable for a pure nondisclosure unaccompanied by a misleading statement, misleading conduct, or duty to disclose. They correctly observe that silence, unaccompanied by a duty to disclose, is not actionable as fraud. See TransPetrol, 764 So. 2d at 879-80. And it is logically true that if a jury were to look solely at the Engle Phase I finding of "omissions" and a reliance instruction that allowed it to find fraud if the plaintiff relied on the fact omitted, then there is at least a theoretical possibility that PM or Reynolds could be held liable in fraud for pure silence about the health effects or addictive properties of cigarettes.[8] But to the extent this is a problem, it is not a problem for the element of reliance to solve.

---

[8]Whether this logical possibility extends beyond theory to a real-world application is an open question that we need not address. The Estate argues that this possibility is wholly theoretical because the proof in this case includes evidence of decades-long advertising campaigns and the creation of a false controversy over the effect of smoking that by its nature included statements rendered misleading by the concealment or omission of material facts.

- 26 -

The question of whether a defendant has a duty to make a disclosure is legally and factually distinct from the question of whether a plaintiff relied on a nondisclosure. The question of duty to disclose hinges on whether the defendant has done something toward the plaintiff or occupies a status with respect to the plaintiff that obligates the defendant to make a disclosure. See, e.g., Metcalf v. Johnson, 113 So. 2d 864, 868 (Fla. 2d DCA 1959) ("Where persons sustain towards another a relation of trust and confidence, their silence when they ought to speak, or their failure to disclose what they ought to disclose, is as much a fraud in law as an actual affirmative false representation."). The question of reliance, in contrast, asks whether a misapprehension as to the undisclosed fact took on significance in the mind of the plaintiff and influenced his decision-making with respect to the matter at issue to his detriment. See, e.g., Raymond, James & Assocs., Inc. v. Zumstorchen Inv., Ltd., 488 So. 2d 843, 845-46 (Fla. 2d DCA 1986) (holding that plaintiff satisfactorily alleged detrimental reliance where it alleged that it entered into the transaction based on its belief in the defendants' representations). In other words, reliance is not focused on the defendant's duty but rather on the plaintiff's reaction to a misstated, concealed, or omitted fact.

PM and Reynolds' concern about the absence of the words "a statement" from the jury instructions is actually linked to the question of duty, not the question of reliance. See, e.g., Marriott Int'l, Inc. v. Am. Bridge Bahamas, Ltd., 193 So. 3d 902, 908 (Fla. 3d DCA 2015) ("A duty to disclose may arise where a party undertakes to disclose certain facts, such that the party must then disclose the entire truth known to him. Such a claim, however, must be supported by some evidence of a statement that would

- 27 -

trigger the further duty to disclose all known material facts." (emphasis added) (citation omitted)).  The risk of PM's or Reynolds' being held liable for an omission in the absence of a duty to disclose is thus not the result of a failure to require reliance on a statement but rather is the result of one of two possible conditions: (1) that the Phase I Engle findings necessarily embrace a disclosure obligation that cannot be relitigated in every Engle progeny case or (2) that a jury instruction directed to the question of an Engle defendant's disclosure obligations may be proper if requested and implicated by the evidence in the case.  We express no opinion on either possibility because they are not before us.  We hold only that the element of reliance cannot do the work that PM and Reynolds ask of it here.

Having determined that a special jury instruction demanding reliance on "a statement" was not required in this case, we consider the special instruction the trial court gave—namely, that the jury could find the reliance element satisfied if the evidence showed that Douglas Duignan "reasonably relied to his detriment that [PM and Reynolds] would not conceal or omit disclosure of such material information."  This instruction was both inaccurate and misleading.  It in essence told the jury that it could find reliance if it found that Douglas Duignan generally relied on the tobacco companies to disclose all material information, without requiring it to find that the material information the tobacco companies concealed or omitted was in fact important to his decisions to begin or continue smoking.  Because the very purpose of the reliance requirement is to determine whether the plaintiff acted differently because of PM's or Reynolds' concealment or omission of facts, this instruction was misleading.

- 28 -

It also may have made a difference to the outcome. As described above, the notion that Douglas Duignan started or continued smoking because he enjoyed smoking and not because of anything PM or Reynolds said or failed to say was a key element of their defense. A proper instruction—one that required reliance on either a statement or on a misapprehension as to a concealed or omitted fact—would have required the jury to consider that possibility and determine whether the tobacco companies were correct as to the reasons for Douglas Duignan's actions. The instruction the trial court gave, in contrast, allowed the jury to ignore this aspect of PM and Reynolds' defense because, if Douglas Duignan's general reliance on them to disclose everything is sufficient to prove reliance, there was no reason for the jury to consider whether any particular undisclosed fact would have made a difference to his decisions about smoking. Accordingly, the error in these instructions might reasonably have misled the jury and constitutes reversible error. See, e.g., Fla. Power & Light Co. v. McCollum, 140 So. 2d 569, 569 (Fla. 1962) (concluding that the proper "inquiry is whether the jury might reasonably have been misled" and concluding that such constitutes a miscarriage of justice under the civil harmless error statute in effect at the time); Gerard v. Kenegson, 151 So. 2d 26, 28 (Fla. 2d DCA 1963) ("In view of the fact that instruction . . . was erroneous[,] and since the instruction can be reasonably calculated to confuse and mislead the jury, the giving of the instruction was error."); Veliz v. Am. Hosp., Inc., 414 So. 2d 226, 228 (Fla. 3d DCA 1982) ("An instruction which tends to confuse rather than enlighten the jury is cause for reversal if it may have misled the jury and caused them to arrive at a conclusion that otherwise they may not have reached."); see also § 59.041, Fla. Stat. (2015) (setting forth the civil harmless error

- 29 -

standard for appellate review and containing the same miscarriage of justice language as that cited in <u>Florida Power & Light</u>).

At oral argument, the Estate contended that this defect in the reliance instruction was harmless because the trial court, at PM and Reynolds' request, also instructed the jury on materiality, telling it that "material information is that which is of such importance that it would have made a difference in Douglas Duignan's actions if it had been disclosed."[9] Thus, according to the Estate, the materiality instruction effectively required the jury to answer the question that the reliance instruction should have asked. We disagree. Neither the jury instructions nor the verdict form required the jury to determine materiality. On the contrary, the jury was instructed to take materiality as a given. It was told that the <u>Engle</u> Phase I findings conclusively

_____

[9]This instruction appears to be based on a standard instruction in civil cases. <u>See</u> Fla. Std. Jury Instr. (Civ.) 409.5 ("A material fact is one that is of such importance that (claimant) would not have [entered into the transaction] [acted], but for the false statement."). There may be reason to question whether this standard instruction is legally correct. Materiality is generally evaluated under an objective test— inquiring whether a misrepresented or omitted fact would have taken on significance in the mind of a reasonable person. <u>See</u> <u>Moustafa v. Omega Ins. Co.</u>, 201 So. 3d 710, 715 (Fla. 4th DCA 2016) (holding that materiality, as used in statute regarding false representations in an insurance policy application, is to be determined under an objective test); <u>Silverman v. Pitterman</u>, 574 So. 2d 275, 276 (Fla. 3d DCA 1991) ("A material fact is generally defined as one to which a reasonable person would attach importance in determining a choice of action."); <u>see also</u> <u>Basic Inc. v. Levinson</u>, 485 U.S. 224, 240 (1988) (holding, under federal securities fraud statute, that "materiality depends on the significance the reasonable investor would place on the withheld or misrepresented information"); Dan B. Dobbs, <u>The Law of Torts</u> § 476 at 1363 (West 2001) ("Representations are material if a reasonable person would want to consider the fact represented in determining whether to enter the transaction in question, and also if a reasonable person would not care about the fact represented but the plaintiff attaches her own idiosyncratic importance to it and the defendant knows it."). <u>But see</u> <u>Atl. Nat'l Bank of Fla. v. Vest</u>, 480 So. 2d 1328, 1332 (Fla. 2d DCA 1985) ("A fact is material if, but for the alleged nondisclosure or misrepresentation, the complaining party would not have entered into the transaction.").

established that PM and Reynolds concealed or omitted material information related to the health effects and addictive properties of cigarettes, and the trial court's specific instructions on the fraudulent concealment and conspiracy claims assumed materiality rather than putting it to the jury to decide. Simply put, because the jury was told both expressly and by implication to assume materiality rather than to decide it, the Estate cannot establish a reasonable probability that the instructional error did not affect the verdict on the fraud by concealment and conspiracy claims. See Special, 160 So. 3d at 1256-57. The instructional error here was not harmless.

At a minimum, the error would require a new trial on the Estate's claims for fraudulent concealment and conspiracy to fraudulently conceal. The parties disagree, however, about whether it also requires a new trial with respect to punitive damages. While the error itself is one worthy of articulation so that it is not repeated in the second trial, we need not reach a determination on what the scope of that error alone would be on remand because we reverse and remand for a new trial on all issues based on the trial court's readback instruction.

### *Conclusion*

For the foregoing reasons, the final judgment is reversed and this case is remanded for a new trial. We certify conflict with Schoeff, Calloway, McKeever, and Grossman with respect to the comparative fault issue in this case.

Reversed and remanded; conflict certified.

KELLY and BLACK, JJ., Concur.

- 31 -